14‑1634‑cv(L)
MHANY Mgmt., Inc. v. Cty. of Nassau et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: May 29, 2015                    Decided: March 23, 2016)

Docket Nos. 14‑1634‑cv(L), 14‑1729‑cv(XAP)

_____

MHANY MANAGEMENT, INC., AKA New York Acorn Housing Company,

*Plaintiff‑Appellee‑Cross‑Appellant*,

NEW YORK COMMUNITIES FOR CHANGE, INC.,

*Intervenor‑Plaintiff‑Appellee‑Cross‑Appellant*,

ACORN, THE NEW YORK ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM NOW, DAPHNE ANDREWS,
VIC DEVITA, VERNON GHULLKIE, NATALIE GUERRIDO,
NEW YORK ACORN HOUSING COMPANY, INC., LISBETT
HUNTER, FRANCINE MCCRAY,

*Plaintiffs*,

v.

COUNTY OF NASSAU, COUNTY OF NASSAU PLANNING
COMMISSION, COUNTY OF NASSAU OFFICE OF REAL
ESTATE & DEVELOPMENT,

*Defendants‑Cross‑Appellees*,

INCORPORATED VILLAGE OF GARDEN CITY, GARDEN CITY BOARD OF TRUSTEES,

*Defendants-Appellants.*

_____

Before: POOLER, LOHIER, and DRONEY, *Circuit Judges*.

Defendants-Appellants the Incorporated Village of Garden City and the Garden City Board of Trustees appeal from an April 22, 2014 final judgment following a bench trial in the United States District Court for the Eastern District of New York (Spatt, *J.*) finding Defendants-Appellants liable for violations of the Fair Housing Act, Section 1981, Section 1983, and the Equal Protection Clause. Plaintiff-Appellee-Cross-Appellant MHANY Management, Inc. and Intervenor-Plaintiff-Appellee-Cross-Appellant New York Communities for Change, Inc. cross-appeal from a February 15, 2012 grant of summary judgment by the same district court in favor of Defendants-Cross-Appellees County of Nassau, County of Nassau Planning Commission, and County of Nassau Office of Real Estate and Development. We affirm in part, vacate in part, and remand.

_____

MICHAEL CARVIN, Jones Day, Washington, DC, *for Defendants-Appellants Incorporated Village of Garden City, Garden City Board of Trustees.*

IRA M. FEINBERG, Hogan Lovells US LLP (Stanley J. Brown, Chava Brandriss, Benjamin A. Fleming, Hogan Lovells US LLP, New York, NY; Joseph D. Rich, Lawyers' Committee for Civil Rights Under Law, Washington, DC; Frederick K. Brewington, Hempstead, NY, *on the brief*), New York, NY, *for Plaintiff-Appellee-Cross-Appellant MHANY Management, Inc., AKA New York Acorn Housing Company & Intervenor-Plaintiff-Appellee-Cross-Appellant New York Communities for Change, Inc.*

GERALD R. PODLESAK, Appeals and Opinions Bureau Chief (Carnell T. Foskey, County Attorney of Nassau County, Ralph J. Reissman, Deputy Nassau County Attorney, *on the brief*), Mineola, NY, *for Defendants-Cross-Appellees County of Nassau, County of Nassau Planning Commission, County of Nassau Office of Real Estate & Planning.*

POOLER, *Circuit Judge*:

This is a housing discrimination case relating to the community of Garden City in Long Island, New York. Defendants-Appellants the Incorporated Village of Garden City and the Garden City Board of Trustees (collectively "Garden City") appeal from an April 22, 2014 final judgment following a bench trial in the United States District Court for the Eastern District of New York (Spatt, *J.*)

finding Garden City liable for violations of the Fair Housing Act, Section 1981, Section 1983, and the Equal Protection Clause. We affirm this decision.

Plaintiff-Appellee-Cross-Appellant MHANY Management, Inc. and Intervenor-Plaintiff-Appellee-Cross-Appellant New York Communities for Change, Inc., (collectively, "Plaintiffs"), also cross-appeal from a February 15, 2012 grant of summary judgment by the same district court in favor of Defendants-Cross-Appellees County of Nassau, County of Nassau Planning Commission, and County of Nassau Office of Real Estate and Development (collectively "Nassau County"). We affirm this decision in part, vacate in part, and remand.

## BACKGROUND

The following facts are drawn from the district court's factual findings after the bench trial, which we accept unless clearly erroneous. *Diesel Props S.r.l v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

**A. Nassau County and Garden City**

The Village of Garden City is a municipal corporation organized under the laws of the State of New York and located in Nassau County. As of the year 2000, individuals of Hispanic or African-American ethnicity comprised 20.3% of

4

Nassau County's population. However, these minority groups comprised a disproportionate share of the County's low-income population. While constituting 14.8% of all households in Nassau County, African-Americans and Hispanics represented 53.1% of the County's "very low" income, non-elderly renter households. In addition, African-Americans made up 88% of the County's waiting list for Section 8 housing. Under the Section 8 program, the federal government provides funds to local housing authorities, which then subsidize rental payments for qualifying low-income tenants in privately-owned buildings. *See* 42 U.S.C. § 1437f(o)(1)(A).

Garden City's African-American and Hispanic population in the year 2000 was 4.1%. However, excluding the 61% of the minority population representing students living in dormitories, Garden City's minority population was only 2.6%. In addition, only 2.3% of the households in Garden City were headed by an African-American or Hispanic person. However, several of the communities surrounding Garden City are "majority-minority," communities in which minorities make up a majority of the population.

Although the lack of affordable housing has long been a problem for Nassau County, Garden City contains no affordable housing.[1] Indeed, in the past, Garden City and its residents have resisted the introduction of affordable housing into the community. According to a Garden City official, in 1989, a developer proposed constructing 51 units of affordable housing at a site in Garden City. This project was never completed, apparently due to a village building moratorium, and a luxury development was ultimately approved for the site. In addition, in May 2006, Nassau County announced that it intended to sell a parcel of County land in Garden City known as the Ring Road Site, for the development of mixed-income affordable housing. But after Garden City residents expressed opposition to the construction of affordable housing in the community, the project was abandoned. Finally, Garden City has repeatedly declined to join the Nassau County Urban Consortium, a group of municipalities in Nassau County that are eligible to receive federal funding to support affordable-housing development.

---

[1] Affordable housing, as defined in this case, means housing which requires no more than 30% of a household's income for households earning 80% or less of the Area Median Income for the Nassau-Suffolk Metropolitan Statistical Area. Special App'x at 119.

**B. The Social Services Site**

In 2002, Nassau County faced a budget and infrastructure crisis. Under the leadership of then-County Executive Thomas Suozzi, the County undertook a Real Estate Consolidation Plan, which involved consolidating County operations in several facilities and selling excess government property in order to raise revenue to fund renovations of the County's existing operations.

One of the properties proposed for sale under the Real Estate Consolidation Plan was a parcel of land owned by Nassau County within the boundaries of Garden City. This parcel of land was part of Garden City's Public or P-Zone. Garden City's P-Zone encompasses numerous Nassau County Buildings, including the Nassau County Police Headquarters, the County Executive Building, and the Nassau County Supreme Court Building.

The portion of the P-Zone site at issue in this case, referred to as the "Social Services Site," is an approximately 25-acre site that housed the former Nassau County Social Services Building, the parking lots for the Nassau County Supreme Court, a garage, an ancillary building, and additional parking facilities. The Social Services Site consists of two segments: (1) 21.44 acres located on the eastern side of County Seat Drive, the site of the former Social Services building

7

and parking facilities; and (2) an additional 3.03 acres located on the western side of County Seat Drive, on which a County-owned building and a parking garage are located.

Nassau County planned to sell the Social Services Site to a private developer, hoping to receive at least $30 million for the property. In order to facilitate this sale, Nassau County turned to Garden City, which controlled the Site's zoning.

**C. Garden City's Rezoning**

In June 2002, at the County's request, Garden City began the process of re-zoning the Social Services Site. This process was managed by the Garden City Board of Trustees, the elected body which governs Village affairs.  In response to the County's request, the Board of Trustees created a sub-committee (the "P-Zone Committee") charged with retaining a planner and reviewing zoning options for the Social Services Site, as well as the remainder of the P-Zone properties in Garden City. This P-Zone Committee consisted of Village Trustees Peter Bee, Peter Negri, and Gerard Lundquist. Trustee Bee was the chairman of the P-Zone Committee. Garden City also retained the planning firm of Buckhurst Fish and Jacquemart ("BFJ") to provide a recommendation with regard to the

8

rezoning of the Social Services Site. Garden City had previously worked with BFJ over several decades. Village officials trusted and respected BFJ's work and generally adopted its recommendations. The P-Zone committee was supervised by Garden City Village Administrator Robert Schoelle, who served as a liaison between the Committee and the Board of Trustees. The Village also hired attorney John Kiernan to advise it on the rezoning process.

In the early part of this rezoning process, BFJ and Garden City emphasized that any proposal should rely on existing zoning mechanisms and respect the existing character of the Village. In a September 13, 2002 fax outlining the general planning principles for redevelopment of the P-Zone properties, BFJ stressed that "[a]ny rezoning associated with the proposed development should be in accordance with the goals and parameters set forth in the zoning code [of Garden City]." App'x at 1063. This fax also emphasized that any proposed development should "be consistent with the existing character and surrounding neighborhoods of Garden City," "not overburden roads, utilities, and schools," and "not tend to depreciate the value of property in the village." App'x at 1063. Similarly, in a November 15, 2002 memorandum entitled "Potential Approach to 'P' Zone Changes," and addressed to the P-Zone Committee, BFJ recommended

9

that Garden City borrow from its existing zoning regulations in rezoning the P-Zone properties, rather than adopt a new form of zoning for the property.

On April 29, 2003, BFJ submitted its proposal to the P-Zone Committee, recommending a "CO-5(b) zone" for the Social Services Site. BFJ proposed applying "multi-family residential group" or "R-M" zoning controls to this property. R-M zoning would have allowed for the construction of up to 311 residential apartment units on the Site, or 75 single-family homes. BFJ reiterated the proposed R-M zoning in a May 2003 report to the P-Zone Committee, stating that the rezoning would "be likely to generate a net tax benefit to the Village." App'x at 1382.

Throughout the rezoning process, the P-Zone Committee also kept Garden City's four Property Owners' Associations ("POAs") apprised of the process. The POAs acted as liaisons between Garden City and the citizens living within their respective neighborhoods. The Social Services Site is located within the neighborhood of the Eastern Property Owners' Association. On May 29, 2003, BFJ gave a PowerPoint presentation of its May 2003 report at a public forum. At the first forum, designed to solicit public input on the proposal, several residents

expressed concern about the impact of 311 residential units on traffic and schools. In response to these citizen concerns, BFJ analyzed these issues further.

In July 2003, BFJ issued a revised version of its study, which reiterated the proposal for R-M zoning. BFJ emphasized again that its proposal "would be careful of not overwhelming the neighborhoods with any significant adverse environmental impacts[,] particularly traffic, visual effects, or burdens on public facilities." App'x at 1115. Responding to issues raised at the citizen forum, the July 2003 report states that "[t]here would be a smaller number of school children generated by the new development than with the development of single-family homes . . . . With a community aimed at young couples and empty nesters[,] there could be as few as 0.2 to 0.3 public school children per unit." App'x at 1123–24. Upon review of the report, the P-Zone Committee adopted BFJ's recommendation for R-M zoning for the approval of the Board of Trustees.

In September 2003, as required by state law, BFJ issued a draft Environmental Assessment Form ("EAF") for the proposed rezoning. The EAF concluded that the proposed rezoning to R-M "will not have a significant impact on the environment." App'x at 1146. The EAF further stated that the proposed multi-family development at the Site would not "result in the generation of

11

traffic significantly above present levels" and would have a minimal impact on schools. *See* App'x at 1155. In addition, the EAF emphasized that "[i]n terms of potential aesthetic impacts, the proposed zoning controls were specifically designed to accommodate existing conditions, respect existing neighborhoods - particularly residential neighborhoods, maximize the use of existing zoning controls and minimize adverse visual impacts." App'x at 1161. Michael Filippon, the Superintendent of the Garden City Buildings Department, concurred in these conclusions.

On October 17, 2003, an ad was placed in the Garden City News entitled, "Tell Them What You Think About the County's Plan for Garden City." App'x at 1639. This notice stated:

> Where is the Benefit to Garden City? Are We Being Urbanized? . . .
>
> The County is asking the Village to change our existing zoning – P (Public use) ZONE – to allow the County to sell the building and land . . . now occupied by the Social Services Building, to private developers. Among the proposed plans: Low-density (high-rise?) housing – up to 311 apartments. . . .
>
> These proposals will affect ALL of Garden City.

App'x at 1639.

12

The Village held a subsequent public forum on October 23, 2003, where BFJ gave another PowerPoint presentation summarizing the proposed rezoning. The record indicates that at this meeting, citizens again raised questions about traffic and an increase in schoolchildren. BFJ again reiterated that traffic would be reduced relative to existing use, and that multi-family housing would generate fewer schoolchildren than the development of single-family homes. In keeping with these conclusions, in November 2003, BFJ presented an additional report to the P-Zone Committee, again confirming its proposal for the R-M zoning control that allowed for a possible 311 apartment units on the Social Services Site. The November 2003 report set forth a draft text for the rezoning.

In light of BFJ's final report, on November 20, 2003, the Garden City Village Board of Trustees unanimously accepted the P-Zone Committee's recommendation for the rezoning. In addition, on December 4, 2003, the Board made a finding pursuant to New York State's Environmental Quality Review Act that the zoning incorporated in what was now termed proposed Local Law 1-2004 would have "no impact on the environment." App'x at 1996. The proposed rezoning would, in keeping with Nassau County's wishes, permit residential development on the Social Services Site in the new CO-5(b) zone. In light of the

13

R-M controls on the property, such development could include multi-family units, or less dense alternatives such as single-family homes. Having endorsed the proposed rezoning, the Board of Trustees moved Local Law 1-2004 to a public hearing.

Starting in January 2004, three public hearings occurred in the span of one month. At the first hearing, on January 8, 2004, residents voiced concerns that multi-family housing would generate traffic, parking problems, and schoolchildren. In response, Filippon emphasized, "[y]ou have to remember that the existing use on that site now generates a certain amount of traffic, a fair amount of traffic. That use is going to be vacated. The two residential uses that are being proposed as one of the alternates, each of which on their face automatically generate far less traffic than the existing use. That is something to consider also." App'x at 1435. In addition, although assured by Garden City officials that the rezoning could result in single-family homes, one resident expressed concern that Nassau County would ultimately only sell the property to a multi-family developer in order to maximize revenue.

On January 20, 2004, the Eastern Property Owners' Association held a meeting at which Trustee Bee discussed BFJ's recommendation for the Social

Services Site. A summary of the meeting reports that "Trustee Bee addressed many questions from the floor" and, in doing so, expressed the opinion that "Garden City demographically has a need for multi-family housing." App'x at 1665. Trustee Bee also reiterated that because relatively few schoolchildren resided in existing multi-family housing in Garden City, BFJ and the Board had reasonably predicted that multi-family housing would have less of an impact on schools than single-family housing. Trustee Bee "indicated he would keep an open mind but he still felt the recommended zoning changes were appropriate." App'x at 1665. In addition, Trustee Bee addressed citizen concerns about the possibility of affordable housing on the Site. In response to one question, Trustee Bee stated that "[a]lthough economics would indicate that a developer would likely build high-end housing, the zoning language would also allow 'affordable' housing (as referred to by [the] resident asking the question) at the [Social Services Site]." App'x at 1665. The meeting notes further indicate that a majority of the residents "who asked questions or made comments" at the meeting supported restricting the rezoning of the Site to single-family homes. App'x at 1665. According to these notes, "[r]esidents want[ed] to preserve the single-family character of the Village. One resident in particular requested the [Eastern

15

Property Owners' Association] Board take a firmer stand on the P-Zone issue and only support R-8 zoning, i.e. zoning for single-family housing. App'x at 1665.

On February 5, 2004, the Village held a third public hearing on the proposed rezoning. The record indicates that this hearing was well attended and much more crowded than usual. App'x at 1209 ("Mindful of the number of people who are here this evening and the likelihood that this hearing will take some time . . . ."). After an introduction by Trustee Bee, the meeting commenced with two presentations. First, Tom Yardley of BFJ emphasized that the proposed rezoning preserved the possibility of single-family homes, and that any multi-family housing would not result in high-rise apartments due to height and density restrictions. Second, Nassau County Executive Suozzi, the author of the County's Real Estate Consolidation Plan, emphasized the County's need to sell the Social Services Site to a private developer, as well as the benefits of developing multi-family housing on the property. During this discussion, a member of the audience interrupted Suozzi.

> Thomas Suozzi: Instead of putting commercial there or single family there, you do something right in between the two that creates a transition from the commercial area from one to the other. I guarantee you that it will be much better than what is there now,

16

> which is a building that is falling apart with a lot of problems in the building, a lot of problems going on around the building on a regular basis and a huge sea of parking. This will make it a much more attractive area for the property. Multi-family housing will be more likely to generate empty nesters and single people moving into the area as opposed to families that are going to create a burden on your school district to increase the burden on the school district
>
> Unidentified Speaker: You say it's supposed to be upscale.
>
> Thomas Suozzi: It's going to be upscale. Single people and senior citizen empty nesters. If you sell your $2 million house in Garden City and you don't want to take care of the lawn anymore, you can go into . . . who lives in Wyndham for example? It's a very upscale place. There's a lot of retirees that live there.

App'x at 1231. When Suozzi finished his presentation, the meeting was opened

to questions from the public. The first question from the audience related to

Trustee Bee's statements "last time," referring to the January 20, 2004 meeting of

the Eastern Property Owners' Association.

> Lauren Davies: I'm just confused between what Mr. Suozzi said about the Social Services Building. You said you wanted it to be upscale, from what I understand from what Peter Bee said the last time is that they wanted it to be affordable housing. . . .
>
> Trustee Bee: Well, either I mis-spoke or you misheard, because I do not recollect using that phrase. If I did it was an inappropriate phrase. The idea was a place for Garden City's seniors to go when they did not wish to maintain the physical structure and cut the lawns and do all the various things. But not necessarily looking at a different style of life. In terms of economics.

17

Thomas Suozzi: We're absolutely not interested in building affordable housing there and there is a great need for affordable housing, but Garden City is not the location. We need to build housing there. . . . We would generate more revenues to the County by selling it to upscale housing in that location. That is what we think is in the character of Garden City and would be appropriate there.

Unidentified Speaker: How do you have control over what the developer does . . .

Trustee Bee: Before the next speaker though, just to finish on that last remark, neither the County nor the Village is looking to create . . . so-called affordable housing at that spot.

Unidentified Speaker: Can you guarantee that, that it won't be in that building?

App'x at 1236–37. In response to these questions, Suozzi indicated that the County "would be willing to put deed restrictions on any property that we sold" so "that it can't be anything but upscale housing." App'x at 1237.[2] In response to further questioning, Suozzi stated "Don't take my word for it, we'll put whatever legal codifications that people want. This will not be affordable housing projects. That's number one." App'x at 1239. Gerard Fishberg, Garden City's counsel,

[2] In a subsequent question, another resident stated that she was "at that meeting," apparently the January 20, 2004 meeting of the Eastern Property Owners' Association, and she "did hear Peter Bee say that he couldn't guarantee that it wouldn't be a [tape change]. So I am really taking your word that it won't be." App'x at 1238. Although the transcript is interrupted by a tape change, we can reasonably infer from the context that this speaker too was requesting assurance that no affordable housing would be built on the Social Services Site.

further noted that the estimated sale prices for multi-family residential units "don't suggest affordable housing." App'x at 1242.

Throughout the remainder of the meeting, residents indicated their opposition to multi-family housing and their preference for single-family homes. App'x at 1242–43 ("I'm completely opposed to any multi-family dwellings in that area. I'm only in support of the single family R-8 units . . . ."). One resident emphasized that the proposed multi-family development was not "in the flavor and character of what Garden City is now. Garden City started as a neighborhood of single family homes and it should remain as such." App'x at 1243. Others stated, to applause from the audience, that "[w]e're not against residential, we're against multi-level residential. (Applause)." App'x at 1249; *see also* App'x at 1252 ("Thomas Suozzi: You would probably like to see single family housing I presume. Unidentified Speaker: Single Family. (Applause)."); App'x at 1254 ("I don't hear a compelling argument from anyone here tonight as to why we should have multi-dwelling homes. Can we take it out of the proposal?"). One resident expressed concern about the possibility of "four people or ten people in an apartment and nobody is going to know that." App'x at 1275.

19

In keeping with these statements, citizens repeatedly expressed concern about limiting the options of a developer.

> Gail Madigan: [W]hen you sell this property you can guarantee that it's . . . what control do you have when you sell it to a developer?
>
> Thomas Suozzi: Guarantee what? What would you like us to guarantee?
>
> Gail Madigan: Well, I would like to know what you are going to be able to do with it. You can tell them . . .
>
> Thomas Suozzi: The zoning controls . . . what you can do.
>
> Gail Madigan: Yeah, but if you sell it to a developer that comes in and is going to make multi-family housing there.
>
> Thomas Suozzi: He wouldn't do that if it was zoned for single family housing. If it's zoned for single family housing you can't put [in] multi-family housing.

App'x at 1253. Another citizen expressed concerns about the possibility of what any multi-family housing might eventually become.

> Anthony Agrippina: We left a community in Queens County that started off similar, single family homes, two family homes, town houses that became – six story units. It was originally for the elderly, people who were looking to downsize. It started off that way. Right now you've got full families living in one bedroom townhouses, two bedroom co-ops, the school is overburdened and overcrowded.

App'x at 1259–60.  In response, another resident emphasized that the only way to control such consequences was to restrict the zoning. App'x at 1260 ("The only

20

guarantee is the zoning. This Board is the only set of people who are here who can guarantee or do that. Mr. Suozzi is not going to be the County Executive forever. We don't know what the predecessors [sic] will do.").

As at the previous meetings, residents also expressed concern about traffic and schools. County and Village officials reiterated that a transition to residential use, including multi-family housing, would generate far less traffic than the existing use of the Social Services Site.

> Thomas Suozzi: One thing that would happen is that you would have 1,000 less employees that work in that building, that would no longer be working there anymore.
>
> Sheila DiMasso: But, we would also have more traffic because of more people owning cars and leaving there in and out. As opposed to . . . [applause]
>
> Thomas Suozzi: You may want to clap for that, but that's irrational. (Applause)

App'x at 1238–39. In addition, Suozzi and Garden City officials tried to explain to citizens their view that the proposed multi-family housing would actually generate fewer schoolchildren than development of single-family homes.

> David Piciulo: If you have 311 units you will have more children potentially in there than 956 single family homes.

Thomas Suozzi: That's not accurate. Based upon statistics, people spend their whole lives looking at this stuff. That's not true. So you may feel that way, but it's not accurate.

David Piciulo: Those are statistics having to do with a national study. If you drive down into the neighborhood, the average home here has two kids. They're in the system for 15 years and you are going to have children in the system . . . let me just make a point.

Gerard Fishberg: Not to argue with you, again, I don't think anybody has prejudged this. How many apartments are there in Wyndham?

Michael Filippon: 312.

Gerard Fishberg: How many school children are there in 312 apartments?

Tom Yardley: Less than twenty.

Gerard Fishberg: Less than twenty children in 312 apartments.

App'x at 1255. BFJ's Fish later testified that those residents who claimed to prefer single-family homes because of school impacts were "simply wrong." App'x at 277.

In response to these questions Suozzi made clear that before any development project was approved at the Site, the developer would have to satisfy state environmental guidelines, including addressing concerns regarding

traffic and impact on public services, such as schools. He further emphasized that these conclusions would be subject to public comment.

In March 2004, in the weeks after this meeting, a flyer began circulating around Garden City. The flyer stated, in relevant part:

> WILL GARDEN CITY PROPERTY VALUES DECREASE IF OVER 300 APARTMENTS ARE BUILT AT THE SITE OF SOCIAL SERVICES? . . .
>
> The Garden City Village Trustees are close to voting on how to zone this property. They might choose to zone it for multi-family housing (If Senator Balboni's current bill passes in June, as many as 30 of those apartments would be considered "affordable housing". According to this bill, "Affordable workforce housing means housing for individuals or families at or below 80% of the median income for the Nassau Suffolk primary metropolitan statistical area as defined by the Federal Department of housing and urban development." . . . NOT JUST GARDEN CITY INCOMES! . . .
>
> ISN'T OUR SCHOOL DISTRICT CROWDED ENOUGH NOW? The trustees are saying that there will be fewer additional students to the Garden City school district if there are 340 apartments or townhouses built at the "P ZONE["] as opposed to 90 single family homes. HOW CAN THEY BE SURE OF THAT? ISN'T IT TRUE THAT MANY FAMILIES MOVE TO GARDEN CITY TO ASSURE THEIR CHILDREN OF A QUALITY EDUCATION? WHAT WILL BRING MORE STUDENTS, OVER 300 FAMILIES OR 90 FAMILIES?

App'x at 1632. The reference to "Senator Balboni's current bill" in the flyer related to legislation pending at the time which would impose affordable-housing requirements on developers on Long Island. The flyer reached Garden

23

City Village Administrator Schoelle, who faxed it to Fish and at least one member of the Board of Trustees. The flyer also came to the attention of Trustee Lundquist.

At a Board meeting held on March 18, 2004, residents again raised concerns about the possibility of affordable housing at the Social Services Site. Schoelle's notes from that meeting indicate that residents expressed concern that the Balboni Bill might apply "retroactive[ly]." App'x at 363. One resident urged decision-makers to "play it safe" with respect to the Balboni Bill and "vote for single family homes." App'x at 362. The following month, Trustee Negri told residents at a Central Property Owners' Association meeting that he and other Village officials met with state representatives to discuss the Balboni Bill. He noted that the bill called for 10% of all new housing developments to include affordable housing, and that a family of four making $67,000 would qualify. Negri indicated that he did not think the bill would pass.

In response to public pressure, BFJ and Garden City began modifying the rezoning proposal. In materials produced in April 2004, BFJ changed the proposal, reducing the number of multi-family units potentially available at the Social Services Site to 215. However, by a memorandum to the Board dated May

24

4, 2004, BFJ scrapped the proposed R-M zoning entirely. Instead, BFJ proposed rezoning the vast majority of the Social Services Site "Residential-Townhouse" ("R-T"), an entirely new zoning classification.  App'x at 1360. The May 2004 proposal only preserved R-M zoning on the 3.03 acres of the Social Services Site west of County Seat Drive, and only by special permit. Thus, the development of multi-family housing would be restricted to less than 15% of the Social Services Site, and only by permit. BFJ's proposed description of the R-T zone defined "townhouse" as a "single-family dwelling unit." App'x at 1361.

Whereas the previous proposed rezoning took more than a year to come before the Board, the shift to R-T zoning moved rapidly through the Village's government. BFJ issued a final EAF for R-T rezoning in May 2004. Even though BFJ officials testified that a switch from R-M zoning to R-T zoning was a significant change, no draft EAF was ever issued for the R-T rezoning. In addition, the shift from the P-Zone to R-T zoning was proposed by the Board as Local Law No. 2-2004 and moved to a public hearing on May 20, 2004. The Trustees further stated at this meeting that they hoped to have a final vote on the rezoning as soon as June 3, 2004, and that the bill had already been referred to

the Nassau County Planning Commission. Explaining the switch, Fish offered the following rationale:

> This was, this was a conscious decision, and I think those of you who might have been at the last two . . . workshops, this was discussed in quite a bit of detail, that there was, there was a concern that if the whole 25 acres were developed for multi family it would generate too much traffic and it didn't serve, it didn't serve as a true transition . . . .
>
> So, that, the proposal has been modified where previously multi family would have been allowed in all 25 acres, as of right, the proposal's been modified so that it's no longer allowed at all as-of-right, you'd have to get a special permit for it, through the Trustees, and it is a condition of the permit is that it can only be to the west of County Seat Drive. So, in essence, what the Trustees have done, is they have reduced the multi family to less than 15 percent of [the] site.

App'x at 1471. At this meeting, a member of the Garden City community thanked the Board of Trustees for responding to the concerns of residents:

> [M]y husband works twelve hour, fourteen hour days so that we can live here. We didn't inherit any money from anyone. We weren't given anything. We didn't expect anything from anyone. We worked very hard to live in Garden City because [of] what it is. And I feel like very slowly it's creeping away by the building that is going on. . . . [A]nd I just think to all of you, just keep, be strong, like, just keep Garden City what it is. That is why people want to come here. You know, it's just a beautiful, beautiful town, people would like to live here, but I just think, just think of the people who live here, why you yourselves moved here. You don't move here to live near apartments. You don't move here so that when you turn your corner there's another high-rise.

26

App'x at 1487–88. Toward the close of this meeting, a member of former Plaintiff ACORN spoke about the need for affordable housing in Nassau County and asked that Garden City consider building affordable housing.

> [W]hat we're saying with respect to the people that live in Garden City, you know, everybody wants to see their community, you know, keep its values. . . .
>
> So, we're asking other communities . . . to share and build affordable housing in their community. I mean, I don't know how we're going to, you know, I guess the county executive [has] to figure out, give respect to each community. It's not just, just not good for affordable housing to be built in s[o]me communities because it impacts on us and our school districts. It's not turning out the best education system we could if we move into the other areas. We'd be able to get, we'd all benefit from it.

App'x at 1499.

ACORN members subsequently attended the Nassau County Planning Commission the following week and again expressed opposition to R-T zoning. At the same time, former Plaintiff MHANY, then known as New York Acorn Housing Company ("NYAHC"), sent a letter to the Nassau County Planning Commission strongly opposing R-T zoning and warning that the new zone would "ensure that developers cannot create affordable multi-family housing." App'x at 1871.

27

On June 3, 2004, Garden City Board of Trustees unanimously adopted the Local Law No. 2-2004 and the Social Services Site was rezoned R-T. The following month, Nassau County issued a Request for Proposals ("RFP") concerning the Social Services Site under the R-T zoning designation. The RFP stated that the County would not consider bids of less than $30 million.

Plaintiffs were unable to submit a bid meeting the specifications of the RFP. Ismene Speliotis, Executive Director of NYAHC/MHANY, analyzed the R-T zoning and concluded that it was not financially feasible to build affordable housing under R-T zoning restrictions at any acquisition price. Testifying at trial, Suozzi concurred with this assessment. Recognizing the futility of an affordable-housing bid under R-T zoning, NYAHC contacted the County to work on a proposal that would include multi-family affordable housing, and "urge[d] the Planning Commission to delay any action on [its] proposal while its legal and policy implications are considered more carefully." App'x at 1871. NYAHC and New York ACORN met with Suozzi and other County officials to discuss the possibility of including affordable housing on the Social Services Site. But the County did not reissue the RFP. Failing in these negotiations, on September 10,

28

2004, NYAHC submitted a non-conforming "protest" proposal to the County for development of the Social Services Site.

The County ultimately awarded the contract to develop the Social Services Site to Fairhaven Properties, Inc. ("Fairhaven"), a developer of single-family homes, for $56.5 million, the highest bid. Fairhaven proposed the development of 87 single-family detached homes, and did not include any townhouses.

After the contract was awarded to Fairhaven, NYAHC prepared four proposals, or "pro formas," for development at the Social Services Site under the R-M zoning designation, with the percentage of affordable and/or Section 8 housing units of the 311 total rental units ranging from 15% to 25%. Plaintiffs' expert Nancy McArdle evaluated each proposal in conjunction with the racial/ethnic distribution of the available pool of renters and determined that, had NYAHC been able to build housing under any of the four proposals in accordance with the rejected R-M zoning designation, the pool of renters likely to occupy all units, including market-rate, affordable, and Section 8 units, would have likely been between 18% and 32% minority, with minority households numbering between 56 and 101. Under the proposal predicting 18% minority

population, NYAHC would have been able to bid $56.1 million for the Social Services Site.

McArdle further analyzed the likely racial composition of the pool of homeowners who could afford to purchase single-family units potentially developed by Fairhaven. She determined that between three and six minority households could afford such a purchase. Thus, while the NYAHC proposals would likely increase racial diversity in Garden City, McArdle testified, the Fairhaven proposal would likely leave the racial composition of Garden City "unchanged."

**D. Procedural History**

On May 12, 2005, ACORN, NYAHC, and several individual Plaintiffs filed suit against Garden City and Nassau County. Plaintiffs asserted claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., as well as 42 U.S.C. § 1981, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. Plaintiffs principally argued that Garden City's shift from R-M to R-T zoning was racially discriminatory, and that Nassau County failed to prevent this discrimination. Plaintiffs also argued that the abandonment of R-M zoning in favor of R-T zoning had a disparate impact on minority groups, and thus

violated the disparate-impact component of the Fair Housing Act. Finally, Plaintiffs argued that Nassau County's actions and policies in steering affordable housing to certain communities violated its obligations under Title VI of the Civil Rights Act not to discriminate in the administration of federal funding, and under Section 808 of the Fair Housing Act to affirmatively further fair housing.

On July 21, 2006, the district court (Bianco, *J.*) denied Garden City and Nassau County's motions to dismiss in their entirety. The district court rejected Defendants' arguments that Plaintiffs lacked standing and concluded that they had adequately alleged discrimination on the basis of race. Accordingly, the district court directed the parties to discovery.

ACORN disbanded in early 2010. At the same time, NYAHC changed its name to MHANY. In addition, NYCC, an organization with the same goals and mission, and many of the same members as ACORN, moved to intervene in this litigation. On June 15, 2010, the district court (Spatt, *J.*) granted NYCC permission to intervene as ACORN's practical successor. SJA 135.

By Memorandum and Order dated February 15, 2012, the district court (Spatt, *J.*) (1) granted the County's motion for summary judgment and dismissed all claims against the County, and (2) denied Garden City's motion for summary

judgment. The district court concluded Nassau County was not causally responsible for the alleged discriminatory conduct of Garden City. The district court also rejected Plaintiffs' challenge to the County's policies regarding the siting of affordable housing under Section 808 of the Fair Housing Act, concluding that Plaintiffs lacked a private cause of action to enforce this provision. The district court did not address Plaintiffs' parallel claim under Title VI of the Civil Rights Act, assuming that this claim was premised on the alleged discrimination regarding the Social Services Site.

In resolving the summary judgment motions, the district court rejected Defendants' arguments that events at the Social Services Site had rendered this case moot. Despite Nassau County's sale contract, the transaction with Fairhaven had never closed, apparently due to the pendency of this litigation. On January 1, 2010, Suozzi was succeeded as County Executive by Edward P. Mangano. In its summary judgment filing, the County informed the district court that rather than proceed with plans for private development, Mangano had decided instead to construct a new Nassau County's Family Court building at the Social Services Site. Defendants thus argued that, because the County government was no longer selling the Site to a private developer, and because Plaintiffs only sought

32

injunctive relief, the case had been rendered moot. The district court rejected this argument, concluding first that it was still possible to grant Site-specific relief to Plaintiffs, and second that even if the Site was not sold, the court could still grant other effectual relief.

On June 17, 2013, the district court commenced a bench trial that spanned eleven days. In a December 6, 2014 post-trial decision, the district court concluded that Plaintiffs had established, by a preponderance of the evidence, liability on the part of the Garden City Defendants for the shift from R-M to R-T zoning under (1) the FHA, 42 U.S.C. § 3601 et seq., based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S.C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The district court reiterated the conclusions of previous opinions that Plaintiffs had standing, and also rejected a renewed mootness argument from Garden City.

The district court subsequently issued an order concerning appropriate remedies in light of Plaintiffs' violations. In a final judgment issued April 22, 2014, the district court granted Plaintiffs the following relief against Garden City: (1) a prohibitory non-discrimination injunction, (2) fair housing training for

33

Garden City officials, (3) a directive to Garden City to pass a Fair Housing Resolution, (4) appointment of a third-party Fair Housing Compliance Officer by Garden City, and (5) expenditure of reasonable sums to fund the relief required by the judgment. The district court also ordered that if Nassau County decided to sell the Social Services Site within one year of the date of judgment, then Garden City must begin the process of rezoning the Social Services Site from R-T to R-M controls. If Nassau County did not make such an announcement, Garden City would be required to (1) join the Nassau County Urban Consortium, a group of Nassau County municipalities eligible for HUD affordable-housing funds; and (2) require that 10% of newly constructed residential development of 5 units or more be reserved for affordable housing.

Garden City then filed the present appeal. Plaintiffs cross-appealed, challenging the district court's grant of summary judgment to Nassau County. JA 1043-44. According to Defendants, Nassau County recently entered into a contract with MPCC Corp. to build the courthouse. On June 9, 2014, MPCC Corp. commenced interior demolition and asbestos abatement. Although construction has begun, the project is not scheduled to be completed until 2018.

34

**DISCUSSION**

Section 804(a) of the Fair Housing Act, also known as Title VIII of the Civil Rights Act of 1968, makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin." 42 U.S.C. § 3604(a). "The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices, including discriminatory zoning restrictions," *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995), and its "results-oriented language counsels in favor of recognizing disparate-impact liability," *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015). For this reason Sections 804(a) and 805(a) of the FHA provide for both discriminatory intent and disparate-impact liability.

**I. Standing**

In analyzing Plaintiffs' standing here, we look to the requirements of Article III. Standing under the Fair Housing Act is as broad as Article III permits. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 362 (2d Cir. 2003) ("Standing under the FHA, whether suit is brought under section 810 or section

35

812 of the Act, is coextensive with Article III standing."). Similarly, the parties do not argue, nor do we discern, any standing concerns that would prevent Plaintiffs from bringing claims under Sections 1981 and 1983.

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). We evaluate Plaintiffs' standing "as of the outset of the litigation." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993).

In challenging standing, Garden City focuses on the latter two prongs of the standing analysis, arguing that Plaintiffs' alleged injury – denial of the opportunity to build affordable housing at the Social Services Site – is not "fairly traceable" to Garden City's rejection of R-M zoning, nor redressable by a favorable decision. Garden City contends, in essence, that there is no guarantee Plaintiffs' bid would have been accepted by Nassau County even under R-M zoning, and no certainty that the project would be built if a court ordered a

36

return to R-M zoning. Garden City notes that, of Plaintiffs' four pro forma bids under R-M zoning, the highest was $56.1 million for a project containing 85% market-rate apartments and 15% affordable housing. This bid was, in relative terms, slightly less than the $56.5 million Fairhaven bid for the development of single-family homes which Nassau County ultimately accepted under R-T zoning. Based primarily on this difference, Garden City speculates that even if the property remained zoned as R-M, Plaintiffs would have nevertheless been out-bid by a market-rate developer, due to Nassau County's hopes of maximizing the sale value of the Site.

Garden City's standing argument requires both improper speculation and unnecessary certainty. As an initial matter, Garden City's argument depends on a level of certainty that we do not typically require in housing discrimination cases. A housing plaintiff need not show with absolute certainty that a project will succeed in order to establish standing. *See Fair Hous. in Huntington Comm. Inc.*, 316 F.3d at 363 ("[A]bsent defendants' challenged conduct, there is a 'substantial probability' that housing with greater minority occupancy would have been built . . . ."). Because of the uncertainties inherent in the housing market, we have permitted housing discrimination plaintiffs to proceed based on

37

"a realistic opportunity to proceed with construction." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 689 F.2d 391, 394 (2d Cir. 1982)

For example, in *Huntington Branch*, this Court emphasized that "[i]ndeterminacy of financing alone . . . is not enough to dismiss [a housing discrimination action at the motion to dismiss stage]." 689 F.2d at 394. Indeed, the Court noted that "the multitude of factors affecting ultimate financing capability are too variable to permit certainty in prediction." *Id.* Of course, "those who have absolutely no realistic financing capability have no standing, because, as to them, invalidation of an offending ordinance would afford only moral satisfaction rather than a realistic opportunity to proceed with construction." *Id.* (internal citation omitted). However, in the case of the plaintiffs, who had proposed a specific project, the Court concluded that "[i]nvalidation of the challenged ordinance . . . would tangibly improve the chances of construction of [the project]." *Id.* at 395; *see also Scott v. Greenville Cty.*, 716 F.2d 1409, 1416 (4th Cir. 1983) (noting "[t]he uncertainty surrounding carrying any large-scale housing development to fruition").

Moreover, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Supreme Court found that the

38

defendants' "challenged action[s]" stood as an "absolute barrier" to the construction project proposed by the plaintiff. *Id.* at 261. If plaintiff "secure[d] the injunctive relief it [sought], that barrier [would] be removed." *Id.* The injunction sought by the plaintiff "would not, of course, guarantee that [the proposed housing development] w[ould] be built." *Id.* The Court recognized that the plaintiff "would still have to secure financing, qualify for federal subsidies, and carry through with construction." *Id.* (footnote omitted). But the Court concluded that such contingencies associated with housing development did not eliminate standing, because "all housing developments are subject to some extent to similar uncertainties." *Id.* The Court found that the plaintiff's proposed project was sufficiently "detailed and specific" that no undue speculation was required to establish standing. *Id.*

In challenging standing here, Garden City essentially demands the sort of certainty rejected in *Arlington Heights* and *Huntington Branch.* Pointing to the slight difference between Plaintiffs' bid and the Fairhaven bid, the only other market-rate bid in the record, Garden City contends that Plaintiffs cannot *guarantee* that they would have outbid a market-rate developer. But Garden City neglects to mention that, in addressing this exact same standing argument, the

39

district court concluded, as a factual matter, that Plaintiffs' bid and the Fairhaven bid were "directly competitive." Special App'x at 140. Given the relatively small difference in bids – a matter of only 0.7% – this finding was not clearly erroneous.[1] *See Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 84–85 (2d Cir. 2014) (noting that while we review a district court's legal conclusion as to standing de novo, we review the factual findings underlying this determination only for clear error).

Garden City also argues this case is distinguishable from *Huntington Branch* and *Arlington Heights* because in those cases, the plaintiffs had secured conditional contracts or options on the relevant properties. But "the plaintiff who challenges a zoning ordinance or zoning practice[] [need not] have a present contractual interest in a particular project" to have standing. *Warth v. Seldin*, 422 U.S. 490, 508 n.18 (1975). Given the uncertainties associated with financing in the

---

[1] Although Garden City never directly challenges the district court's finding as clearly erroneous, it does at times refer to Fairhaven's bid for the Social Services Site as in the amount of $58.1 million. Garden City does not explain this $1.6 million discrepancy, but we note that it appears to be driven by $226,000 in transfer taxes and a $1.3 million brokerage commission. However, Garden City neglects to mention that the purchase price proposed by Fairhaven, the number seemingly directly comparable to the purchase price proposed by Plaintiffs, is only $56.5 million. Accordingly, we find no clear error in the district court's determination that these two bids were "directly competitive."

housing market, the fact that Plaintiffs' bid was directly competitive with the only market-rate bid in the record provides us reason to believe that "[i]nvalidation of the challenged ordinance . . . would tangibly improve the chances of construction of [the project]." *Huntington Branch*, 689 F.2d at 395. Although overturning the shift to R-T zoning would not *guarantee* Plaintiffs' success, given their ability to bid neck-and-neck with a market-rate bidder, the district court appropriately concluded that they enjoyed a "realistic opportunity to proceed with construction." *Id.* at 394. To demand more "would be to close our eyes to the uncertainties which shroud human affairs." *Id.* "Redressability is not a demand for mathematical certainty." *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 143 (3d Cir. 2009).[2]

Despite the district court's conclusion that Plaintiffs' bidding was competitive with the only market-rate bid in the record, Garden City argues that

---

[2] We note that both *Arlington Heights* and *Huntington Branch* were decided at the motion to dismiss stage, and that this case has proceeded to a bench trial. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that, at trial, the facts supporting standing "must be supported adequately by the evidence adduced at trial" (internal quotation marks omitted)). Nevertheless, this distinction is immaterial to our reasoning. Just as we do not require *allegations* of certain success at the pleading stage, we do not require *proof* of certain success at the trial stage. *Id.* (noting that the elements of standing must be shown "with the manner and degree of evidence required at the successive stages of the litigation").

41

other *hypothetical* bids under R-M zoning from for-profit developers might have been higher than the Fairhaven bid. Yet Garden City's argument on this point is founded in pure speculation. Garden City theorizes that because luxury apartments would provide more units than single-family homes, this would likely increase the return to the developer, and thus raise the bid price the project could support. But no such market-rate bids for apartments exist in the record. Moreover, our review of the record does not reveal a clear answer to Garden City's surmise. *Compare* App'x at 1286 (BFJ zoning study suggesting that apartments, although each lower priced than single-family houses, would yield a greater total market value in light of the greater number of units), *with* App'x at 1104 (suggesting differing estimates for whether single-family homes or multi-family development would yield a higher land value). Moreover, the mere fact that Plaintiffs' bid includes an affordable-housing element does not necessarily mean that a hypothetical market-rate apartment developer would outbid them. As Plaintiffs note, an affordable-housing developer, unlike a market-rate developer, need not consider profit in making its bid proposal. Moreover, affordable-housing developers have access to sources of funds a market-rate

42

developer does not, including tax credits and others government programs encouraging affordable housing.

**II. Mootness**

Next, both Nassau County and Garden City argue that, even if Plaintiffs had standing at the outset of this litigation, this case is now moot. In light of the County's plans to construct a courthouse on the Social Services Site, they contend any injury to Plaintiffs regarding inability to construct affordable housing on the Site is no longer caused by purported discriminatory zoning. Rather, the superseding source of this injury is the decision to build a courthouse.

Defendants, and Garden City in particular, rely on the principle that mootness is "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)); *see also* Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973) (providing the source of this formulation).

This principle, however, is "not comprehensive," *Laidlaw*, 528 U.S. at 190, and it fails to capture exceptions to mootness, particularly voluntary cessation

cases and cases capable of repetition but evading review, *id.* These exceptions underline the different aims of the standing and mootness doctrines. The burden of establishing standing falls on the plaintiff, as it "functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Id.* at 191. By contrast, the burden of showing mootness logically falls on a defendant because, "by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal." *Id.* at 191–92.

In our view, this case is appropriately analyzed under the voluntary cessation doctrine. Under this principle, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see also Laidlaw*, 528 U.S. at 189 (stating the voluntary cessation doctrine applies in cases "mooted by the defendant's voluntary conduct"). "The voluntary cessation of allegedly illegal activities will usually render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and

44

irrevocably eradicated the effects of the alleged violation." *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002) (internal quotation marks omitted).

At bottom, the "rule traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001). "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden. of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190 (emphasis added). This is both a stringent, *City of Mesquite*, 455 U.S. at 289 n.10, and a formidable burden, *Laidlaw*, 528 U.S. at 190.

In this case, we are deeply skeptical that Defendants have met their "formidable burden" of showing that it is "absolutely clear" that the Social Services Site will never be used for housing. We are unpersuaded that the County has committed to this course permanently. Although we recognize that when "the defendant is a government entity, some deference must be accorded to a legislative body's representations that certain conduct has been discontinued," *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365,

45

376 (2d Cir. 2004) (internal quotation marks and alterations omitted), some deference does not equal unquestioned acceptance. Indeed, in *City of Mesquite*, the Supreme Court reached the merits despite the fact that the offending language in the challenged ordinance had been removed during the pendency of the appeal. 455 U.S. at 289. In finding the case not moot, the Court noted that "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Id.*

Here, suspicious timing and circumstances pervade the County's decision to build a courthouse. Although the County has authorized funding for the courthouse and has contracted with a construction management corporation, Plaintiffs argue compellingly that various actions with respect to the courthouse project appear to track the development of this litigation. For example, the County announced its decision to build a courthouse on the Social Services Site only on the eve of summary judgment motions. The County claims that plans for the courthouse were in place as early as 2010. App'x at 118 (noting that schematic designs for the building were issued in 2010). Despite counsel's "continuing duty to inform the Court of any development which may conceivably affect [the]

46

outcome" of litigation, *Fusari v. Steinberg*, 419 U.S. 379, 391 (1975) (Burger, C.J., concurring), the County failed to notify the district court of the proposal until 2011, when it moved for summary judgment, App'x at 119 (affidavit submitted February 2011).

The Supreme Court has viewed mootness claims skeptically when they are not timely raised. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000) ("[O]ur appraisal of Pap's affidavit is influenced by Pap's failure, despite its obligation to the Court, to mention a word about the potential mootness issue in its brief in opposition to the petition for writ of certiorari . . . ."). Bolstering our skepticism of Defendants' mootness claim, Plaintiffs assert, and Defendants do not contest, that the project was dormant for years after Nassau County was dismissed at the summary judgment stage, and the threat of liability against the County diminished. Although Defendants note construction fences were recently put up around the Site, Plaintiffs observe, again without contradiction, that these fences went up approximately around the time the parties filed the respective notices of appeal in this case, and the threat of liability against Nassau County again reemerged. *Cf. Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 89 (2d Cir. 2005) (finding the voluntary cessation doctrine applicable where "there

47

[was] no reason to doubt the sincerity of defendants' representation to the court"
that the challenged conduct had ceased).

Nor are we persuaded by Defendants' contentions that the injuries of two workers during construction on the Site, along with asbestos abatement and interior demolition, render the County's decision to build a courthouse irreversible. Defendants argue that two workers have been injured during construction. Asbestos abatement and interior demolition, at least on the basis of the record before us, would appear to be actions necessary before *any* action could be taken on the Site. In fact, the article cited in Garden City's brief makes no mention of a courthouse, noting only that the workers were injured performing asbestos abatement on the Social Services Site.

The County asserts that the courthouse project is in response to an emergency need for a new courthouse. But the County's own filings indicate the County has been aware of the alleged urgent need for a new courthouse since at least 2004. "[An] emphasi[s] that the change had been under consideration long before the federal lawsuit . . . of course cuts two ways." *United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 676 (2d Cir. 1996). We are left wondering whether the courthouse project represents a convenient distraction, rather than a valid claim,

48

which the County can cite when under threat of liability, only to ignore it when the threat of liability has passed. *See Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 723 n.3 (2010) (Alito, J., dissenting) ("Particularly in light of Hastings' practice of changing its announced policies, these requests are not moot.").

Nor are we persuaded that a 2011 magistrate judge's order stating that the County's decision to build the courthouse was "final," App'x at 101, conclusively resolves this issue. The district court did not view this order as conclusively resolving the issue of mootness, construing the question de novo in both its summary judgment opinion and at trial. Finally, although Garden City argues that we are barred from reviewing this finding on appeal because it was not specifically challenged by Plaintiffs. Plaintiffs are inherently challenging the basis for this ruling, and "a notice of appeal from a final judgment brings up for review all reviewable rulings which produced the judgment." *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 178 (2d Cir. 2000) (internal quotation marks omitted).

There are simply too many questions surrounding construction of the courthouse for us to conclude that it is "absolutely clear" that the parties will not

resume the challenged conduct. We recognize that the County may ultimately be sincere in its efforts to build a courthouse. However, given its actions up to this point, we conclude that on the present record the County has not met its "formidable burden" of showing that it will not permit the challenged conduct to resume.

Though we conclude it is not "absolutely clear" that Nassau County will not return to the challenged conduct, we need not decide at this time the parties' other arguments concerning mootness.

**III. Disparate Treatment**

The district court concluded that Garden City's decision to abandon R-M zoning in favor of R-T zoning was made with discriminatory intent. "The Supreme Court has long held, in a variety of circumstances, that a governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens." *United States v. Yonkers Bd. of Educ. (Yonkers I)*, 837 F.2d 1181, 1224 (2d Cir. 1987); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). We find no clear error in the district court's determination

that Garden City's decision to abandon R-M zoning was a knowing response to the vocal and racially influenced opposition among Garden City's citizenry.

**A. Plaintiffs' Prima Facie Case**

A plaintiff can establish a prima facie case of disparate treatment "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc-Sternberg*, 67 F.3d at 425 (internal quotation marks omitted). This Court is required to give substantial deference to the trial court's findings, and may not set them aside unless they are clearly erroneous. *See Diesel Props S.r.l.*, 631 F.3d at 52 ("After a bench trial, the court's '[f]indings of fact, whether based on oral or other evidence, must not be set aside unless [they are] clearly erroneous.'" (quoting Fed. R. Civ. P. 52(a)(6))). We review a district court's finding of discrimination after a bench trial for clear error. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) ("The district court's finding of intentional discrimination was not clearly erroneous.").

In finding intentional racial discrimination here, the district court applied the familiar *Arlington Heights* factors. *See Arlington Heights*, 429 U.S. at 267.

51

Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it bears more heavily on one race than another may provide an important starting point." *Id.* at 266 (internal quotation marks and citation omitted). But unless a "clear pattern, unexplainable on grounds other than race, emerges," *id.*, "impact alone is not determinative, and the Court must look to other evidence," *id.* (footnote omitted). Other relevant considerations for discerning a racially discriminatory intent include "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267, "[d]epartures from the normal procedural sequence," *id.*, "[s]ubstantive departures," *id.*, and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *id.* at 268.

Here, the district court premised its finding of racial discrimination primarily on two of these factors: (1) impact, i.e. "the considerable impact that [the Village's] zoning decision had on minorities in that community"; and (2)

sequence of events, i.e. "the sequence of events involved in the Board's decision to adopt R-T zoning instead of R-M zoning after it received public opposition to the prospect of affordable housing in Garden City." Special App'x at 161. The district court noted a history of racial discrimination in Garden City, but declined to place "significant weight" on this factor. *See* Special App'x at 151 ("Although [past events] could tend to suggest that racial discrimination has historically been a problem in Garden City, the Court declines to place significant weight on them for various reasons.").

The district court first noted statistical evidence that the original R-M proposal would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted as law by Garden City. However, in making its finding of discrimination, the district court relied primarily on the sequence of events leading up to the implementation of R-T zoning. The court first noted that Garden City officials and BFJ were initially enthusiastic about R-M zoning. BFJ's proposal permitted the development of up to 311 multi-family units, and Trustee Bee expressed the opinion at a January 20, 2004 meeting that "Garden City demographically has a need for multi-family housing," and that

53

"he would keep an open mind but he still felt the recommended zoning change were appropriate." App'x at 1665.

However, the district court concluded that BFJ and the Board abruptly reversed course in response to vocal citizen opposition to the possibility of multi-family housing, including complaints that affordable housing with undesirable residents could be built under this zoning. At a February 4, 2004 meeting, Trustee Bee stated that "neither the County nor the Village is looking to create . . . so-called affordable housing." App'x at 1236. BFJ and the Board subsequently endorsed the R-T proposal, which banned the development of multi-family housing on all but a small portion of the Social Services Site and then only by special permit.

The district court focused on the suddenness of this change. Although the P-Zone Committee had consistently recommended R-M zoning for eighteen months, R-T zoning went from proposal to enactment in a matter of weeks. The district court noted that BFJ's consideration of R-T zoning was not nearly as comprehensive and deliberative as that for R-M zoning. In addition, the court found it strange that members of the P-Zone Committee – the Village officials most familiar with the situation – were excluded from the discussions regarding

54

R-T zoning. Indeed, after a final public presentation on the proposed R-M zoning in April 2004, Schoelle, Filippon, and Fishberg met with BFJ to review the public comments. For some unknown reason, members of the P-Zone Committee did not participate in this meeting, and neither did the Village's zoning counsel Kiernan. The district court also found it peculiar that Local Law 2-2004, adopting R-T zoning, was moved to a public hearing even though no zoning text had yet been drafted and no environmental analysis of the law's impact had been conducted. Thus, in rejecting Garden City's argument below that the adoption of R-T zoning was business as usual, the district court concluded that Garden City was "seeking to rewrite history." Special App'x at 153.

Although now recognizing the oddness and abruptness of this sequence of events, Garden City argues that these facts should not raise any suspicion. The Village contends that because BFJ, the Village Trustees, and Village residents had discussed the zoning of the Site for more than a year, there was no need to spend additional time discussing the same issues once they settled on a preferable lower-density approach. While the adoption of R-T zoning may seem rushed, and appear to be an abrupt change from Garden City's prior consistent course of conduct, according to Garden City, this was actually just efficient local

55

government. Given the amount of time already invested in studying the Social Services Site, R-T zoning could proceed more quickly through the legislative process. While this may be one reasonable interpretation of the facts, the district court was nevertheless entitled to draw the contrary inference that the abandonment of R-M zoning was an abrupt change and that the "not nearly as deliberative" adoption of R-T zoning was suspect. Special App'x at 153–54. Indeed, it is a bedrock principle that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

In considering the sequence of events leading up to the adoption of R-T zoning, the district court also focused closely on the nature of the citizen complaints regarding R-M zoning. Citizens expressed concerns about R-M zoning changing Garden City's "character" and "flavor." App'x at 1243. In addition, contrary to Garden City's contentions that any references to affordable housing were isolated, citizens repeatedly and forcefully expressed concern that R-M zoning would be used to introduce affordable housing and associated undesirable elements into their community. Residents expressed concerns about development that would lead to "sanitation [that] is overrun," "full families

56

living in one bedroom townhouses, two bedroom co-ops" and "four people or ten people in an apartment." App'x at 1260, 1275. Other residents requested that officials "guarantee" that the housing would be "upscale" because of concerns "about a huge amount of apartments that come and depress the market for any co-op owner in this Village." App'x at 1237.

The district court also noted Garden City residents' concerns about the Balboni Bill and the possibility of creating "affordable housing," specifically discussing a flyer warning that property values might decrease if apartments were built on the Site and that such apartments might be required to include affordable housing under legislation pending in the State legislature. This flyer came to the attention of at least two trustees, as well as Fish and Schoelle. Concerned about the Balboni Bill, Garden City residents urged the Village officials to "play it safe" and "vote for single family homes." App'x at 362. Viewing this opposition in light of (1) the racial makeup of Garden City, (2) the lack of affordable housing in Garden City, and (3) the likely number of minorities that would have lived in affordable housing at the Social Services Site, - the district court concluded that Garden City officials' abrupt change of course was a

57

capitulation to citizen fears of affordable housing, which reflected race-based animus.

We find no clear error in the district court's determination. The tenor of the discussion at public hearings and in the flyer circulated throughout the community shows that citizen opposition, though not overtly race-based, was directed at a potential influx of poor, minority residents. Indeed, the description of the Garden City public hearing is eerily reminiscent of a scene described by the Court in *Yonkers I*:

> At the meeting . . . the predominantly white audience overflowed the room. The discussion was emotionally charged, with frequent references to the effect that subsidized housing would have on the "character" of the neighborhood. The final speaker from the audience . . . stated that the Bronx had been ruined when blacks moved there and that he supported the condominium proposal because he did not want the same thing to happen in Yonkers.

*Yonkers I*, 837 F.2d at 1192. Although no one used explicitly racial language at the Garden City public hearing, the parallels are striking. Like the residents in *Yonkers*, Garden City residents expressed concern that R-M zoning would change the "flavor" and "character" of Garden City. App'x at 1243. Citizens requested restricting the Site's zoning to single-family homes in order to preserve "the flavor and character of what Garden City is now." App'x at 1243. Citizens

58

repeatedly requested "guarantee[s]" that no affordable housing would be built at the Social Services Site and that the development would only be "upscale." App'x at 1237–38, 1253. Expressing concerns about the sort of residents who might occupy an eventual complex, one resident feared that the proposed development "could have four people or ten people in an apartment and nobody is going to know that." App'x at 1275. And, as with the emotionally charged scene in *Yonkers*, Suozzi stated that citizens at the public hearing were "yelling at him." App'x at 1246. Finally, recalling the Yonkers resident who spoke regarding the Bronx being "ruined," one resident explained that he had left Queens because apartment buildings originally intended for the elderly resulted in "full families living in one bedroom townhouses, two bedroom co-ops, the school is overburdened and overcrowded. You can't park your car. The sanitation is overrun." App'x at 1260. Another resident stated that she had left Brooklyn to avoid exactly the sort of development potentially available for the Social Services Site.

The district court concluded that, in light of the racial makeup of Garden City and the likely number of members of racial minorities that residents believed would have lived in affordable housing at the Social Services Site, these

59

comments were code words for racial animus. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (observing that it "has become easier to coat various forms of discrimination with the appearance of propriety" because the threat of liability takes that which was once overt and makes it subtle). "Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare. . . . Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms." *Id.* at 1081–82. "[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010) (internal quotation marks and alterations omitted).

Empirical evidence supports the reasonableness of the district court's conclusion. Indeed, "research suggests that people believe that the majority of public housing residents are people of color, specifically, African American." *See* Carol M. Motley & Vanessa Gail Perry, *Living on the Other Side of the Tracks: An*

60

*Investigation of Public Housing Stereotypes*, 32 J. Pub. Pol'y & Marketing 48, 52 (2013); *see also id.* at 50 ("[I]n the United States, public housing residents are perceived as predominantly ethnic peoples (mainly African American) . . . ."). Here, the comments of Garden City residents employ recognized code words about low-income, minority housing.[3] For example, "[o]pponents of affordable housing provide subtle references to immigrant families when they condemn affordable housing due to the fear it will bring in 'families with lots of kids.'" Mai Thi Nguyen, Victoria Basolo & Abhishek Tiwari, *Opposition to Affordable Housing in the USA: Debate Framing and the Responses of Local Actors*, 30 Housing, Theory & Soc'y 107, 122 (2013). Here, invoking this stereotype, Garden City residents complained of "full families living in one bedroom townhouses," App'x at 1260, and "four people or ten people in an apartment," App'x at 1275, as well as the possibility of "overburdened and overcrowded" schools, App'x at 1260. In addition, research shows that "opponents of affordable housing may mention that they do not want their city to become another 'Watts' or 'Bayview-

---

[3] Garden City argues that a code word theory only makes sense when it is the defendant's statements at issue. We disagree. The notion of a code word implies that it will be understood by another. Indeed, *Yonkers I* implicitly recognized the relevance of code words in the context of legislators acting responsively to citizen animus by specifically invoking residents' use of words like "character." 837 F.2d at 1192.

Hunters-Point,' both places with a predominantly African-American population." *Nguyen*, at 123. So too here, Garden City residents expressed concerns about their community becoming like communities with majority-minority populations, such as Brooklyn and Queens. Moreover, "a series of studies have shown that when Whites are asked why they would not want to live near African-Americans (no income level is indicated in the question), common responses relate to the fear of property value decline, increasing crime, decreasing community quality (e.g. physical decay of housing, trash in neighborhood, and unkempt lawns) and increasing violence." *Nguyen*, at 111. Repeatedly expressing concerns that R-M zoning would lead to a decline in their property values as well as reduced quality of life in their community, Garden City residents urged the Board of Trustees to "keep Garden City what it is" and to "think of the people who live here." App'x at 1487–88. Considering these statements in context, we find that the district court's conclusion that citizen opposition to R-M zoning utilized code words to communicate their race-based animus to Garden City officials was not clearly erroneous. *See Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding "'camouflaged' racial expressions" based on concerns "about an influx of 'undesirables,'" who would

62

"'dilute' the public schools"). While another factfinder might reasonably draw the contrary inference from these facially neutral statements, "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 573–74.[4]

In response, Garden City notes that its officials testified that they did not understand the citizen opposition to be race-based. But, quite obviously, discrimination is rarely admitted. *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("A victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence."); *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999) ("[A]n employer who discriminates will almost never announce a

---

[4] Although the district court declined to place significant weight on subsequent objections to affordable housing in Garden City, as further support for its conclusion, the district court could have also looked to more overtly race-based opposition to the subsequent Ring Road development. Indeed, the comments opposing this development explicitly referred back to the rezoning of the Social Services Site. In comments opposing the Ring Road development in Garden City, citizens accused Suozzi of "catering to ACORN and black people," App'x at 2684, and stated that they were "[a]damantly opposed to low income housing or affordable housing in Garden City – at the [Social Services] property or in the vicinity of Roosevelt Field. You live where you can afford to live – plain and simple . . . it is not a hand-out!" App'x at 2699. These more explicitly race-based comments echoed earlier comments during public hearings. App'x at 1487 ("We worked very hard to live in Garden City because [of] what it is. And I feel like very slowly it's creeping away by the building that is going on.")

63

discriminatory animus or provide employees or courts with direct evidence of discriminatory intent."). The district court reached its conclusion after a lengthy trial, during which the court had the opportunity to hear and evaluate the testimony of numerous witnesses, including all of the relevant Garden City officials. Moreover, there is ample evidence from which to question the credibility of these officials. Trustee Lundquist stated during his trial testimony that he was unsure if Garden City – an overwhelmingly white community – was majority black. Similarly, Building Superintendent Filippon stated that he did not know if Garden City was majority white. Trustee Negri further stated that he could not recall if he had *ever* had a conversation about affordable housing.

In addition to these incredible statements, which the district court would have been entitled to discredit, there was abundant evidence from which the district court could find that Garden City officials clearly understood residents' coded objections to R-M zoning. During his testimony, Village Administrator Schoelle indicated that he knew low-income residents of Garden City were primarily African Americans and Latinos. *Cf. Catanzaro v. Weiden*, 140 F.3d 91, 96 (2d Cir. 1998) ("[Plaintiff] also presents evidence that the Mayor and City officials knew the racial makeup of the Middletown community."). In addition, County

64

Executive Suozzi testified to his knowledge that race is generally a factor in opposition to affordable housing in Nassau County, and that Garden City residents' opposition to affordable housing was motivated, at least in part, by discriminatory animus. App'x 550, 556, 2266-67. Furthermore, employing the code words apparently employed by Garden City residents, Trustee Negri testified that housing occupied by low-income minorities is not consistent with the "character" of Garden City. App'x at 570.

Garden City's argument appears to boil down to the following – because no one ever said anything overtly race-based, this was all just business as usual. But the district court was entitled to conclude, based on the *Arlington Heights* factors, that something was amiss here, and that Garden City's abrupt shift in zoning in the face of vocal citizen opposition to changing the character of Garden City represented acquiescence to race-based animus.

Failing to show clear error in the district court's factual findings, Garden City also argues that the district court applied the wrong legal standard for claims involving official responses to citizen-based discrimination. But the district court recognized the appropriate standard, stating that "[u]nder the theory of disparate treatment, 'a plaintiff can establish a prima facie case by

showing that animus against the protected group "was a significant factor in the position taken" by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" Special App'x at 148 (quoting *LeBlanc-Sternberg*, 67 F.3d at 425) (emphasis omitted). Although Garden City cites this same case and the same standard, it contends that the district nevertheless applied the wrong standard, because at two points in its 65-page opinion, the court noted that the comments of Garden City residents "reflected race-based animus or at least could have been construed as such by the Board." Special App'x at 156, 180. Seizing on the "could have been construed" language, Garden City argues that the district court only found that Garden City officials responded to citizen-based opposition and that this opposition was race-based, but never actually concluded that Garden City officials *knew* this citizen opposition was race-based.

Although Garden City is correct that the standard is not "could have been construed," and local officials must knowingly respond to race-based citizen opposition, we do not think this stray language reflects the legal standard that the court applied. As noted, at other points in its opinion, the district court set out in detail the correct legal standard and cited the exact same cases that Garden

66

City relies on. Moreover, statements during trial indicate that the district court and all of the parties understood the appropriate standard. In denying Garden City's Rule 50 motion at the close of Plaintiffs' case, the district court recognized that Plaintiffs had presented evidence that Garden City officials changed the zoning "to limit minorities from buying in the Garden City area." App'x at 808. In addition, during trial and in their post-trial briefing, both parties made this standard clear. App'x at 801 (defendants reiterating that "plaintiffs must show that . . . animus against the protected group was a significant factor in the position taken by the municipal decision makers themselves or by those to whom the decision makers were knowingly responsive"); App'x at 805 (plaintiffs arguing that "it is disingenuous of [Garden City's] decision makers, for example trustee [Bee] . . . to claim that they did not know that racial animus played a part in residents['] opposition to multifamily and affordable hous[ing]"); App'x at 1013 ("Garden City government officials could not have been unaware that their constituents' opposition to affordable housing was grounded in opposition to the likely minority occupants of such housing."). In light of these statements, we believe the district court understood the applicable standard.

In any case, as discussed at length, the district court's analysis and factual findings support the conclusion that Garden City officials acted with knowledge of their constituents' discriminatory animus. *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011) ("[A]n error in terminology can be harmless so long as the substantive legal standard applied was the correct one."). As the foregoing analysis of the district court's factual findings shows, even if the district court applied a somewhat looser standard, its evidentiary findings are sufficient to support a conclusion of discrimination even under the correct standard, i.e., that Garden City officials knowingly acquiesced to race-based citizen opposition. Accordingly, we find no error in the district court's conclusion that Plaintiffs have made out a prima facie case of racial discrimination.

**B. Discrimination Vel Non**

Garden City argues that, even if Plaintiffs have made out a prima facie case, its residents opposed (and its officials understood them to oppose) R-M zoning based on legitimate concerns. Although it expressed significant skepticism about the legitimacy of these non-discriminatory motives, the district court concluded that these other reasons may have played some role in the rezoning decision. However, applying a mixed-motive analysis, the district court

nevertheless concluded that discrimination against minorities played a determinative role in the shift from R-M to R-T zoning. We find no error in the district court's mixed-motive analysis and affirm its conclusion.

Once a plaintiff presents a prima facie case of discrimination based on the *Arlington Heights* factors, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002). Here, the district court found that Garden City met its minimal burden of production on this issue, as Garden City contended that R-T zoning was adopted instead of R-M zoning because of concerns regarding traffic and school crowding, and because R-T zoning would facilitate the development of townhouses as a residential form.

If a defendant meets its burden of production, "the sole remaining issue is discrimination *vel non*. The plaintiffs . . . must prove that the defendants intentionally discriminated against them on a prohibited ground." *Id.* (internal quotation marks, citations, and alterations omitted). Although noting that some of Garden City's alternative justifications for the rezoning were "not just disputed, but unsupported by the record," Special App'x at 160, the district court expressed reluctance "to second-guess citizens and decision-makers' legitimate

69

concerns about traffic and the promotion of townhouses, even if those concerns may have been ill-founded," Special App'x at 160. Deeming these additional concerns legitimate, the district court followed our decision in *Cabrera v. Jakabovitz*, 24 F.3d 372, 383 (2d Cir. 1994), and applied the mixed-motive analysis set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244–45 (1989) to Plaintiffs' claims.

While this standard has been modified by statute in the context of Title VII, there is no indication it remains inapplicable to claims under the Fair Housing Act, and therefore a plaintiff bears the "burden of proof" in showing "that the adverse action was motivated, at least in part, by an impermissible reason." *Cabrera*, 24 F.3d at 383. If the plaintiff "has sustained this burden, then the defendant can prevail if it sustains its burden of proving its affirmative defense that it would have taken the adverse action on the basis of . . . permissible reason[s] alone." *Id.*

Here, relying on its analysis of Plaintiffs' prima facie case, the district court concluded that the shift in zoning had been motivated, at least in part, by discriminatory animus. It then proceeded to the second half of the *Price Waterhouse* analysis – the "same decision" defense – assessing whether Garden

70

City would have taken the same action solely on the basis of its purported legitimate reasons for rezoning. Reviewing these alternative rationales, the district court concluded that even accepting these legitimate reasons, Garden City would not have adopted R-T zoning in the absence of discriminatory animus.

Garden City challenges the district court's mixed-motives analysis. Yet because Garden City is challenging the district court's finding of discrimination, and because these issues are ultimately factual findings, *see Cabrera*, 24 F.3d at 383 (noting that the issue can be decided by a jury), our review is again for clear error. *See Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 206 (D.C. Cir. 1997), ("This constituted an acceptable finding of mixed motives, and was not clearly erroneous."), *vacated in part on reh'g* 1998 WL 1988451 (D.C. Cir. 1998). And again, we find no clear error in the district court's factual analysis.

Garden City argues that although citizens expressed concern about the possibility of affordable housing and the residents who might occupy it, public comment focused more broadly on mundane problems such as traffic and school overcrowding. Yet the district court did not err in concluding that these other

rationales were insufficiently weighty to justify a shift from R-M to R-T zoning in the absence of discriminatory intent.

With respect to traffic, Garden City argues that its zoning expert testified that R-T zoning, as compared to R-M zoning, would potentially reduce traffic concerns. While the district court recognized this evidence, it also noted that traffic concerns became important to Garden City officials only after the increase in public opposition to affordable housing. Indeed, when residents raised questions regarding traffic from R-M zoning in 2003 and early 2004, Garden City officials repeatedly dismissed these concerns. Indeed, Suozzi, agreeing with Garden City officials at earlier presentations, criticized traffic-related concerns regarding R-M zoning as "irrational." App'x at 1238–39. Although BFJ's April 2004 presentation stated that R-T zoning would reduce traffic relative to R-M zoning, this study was only prepared after the public meetings, and the district court reasonably questioned the credibility of figures potentially created to justify a particular result. In addition, the district court noted other record evidence suggesting any decrease in traffic between R-M and R-T zoning was de minimis. Fish testified that, even using a conservative approach, the elimination of multi-family housing would only reduce peak traffic by 3%. App'x at 337–38.

The district court thus did not err in questioning whether such concerns were sufficiently strong to cancel out any discriminatory animus.

In conducting its mixed–motive analysis, the district court also appropriately questioned the strength of Garden City's interest in developing townhouses. Although Garden City's zoning expert testified that R-T zoning facilitated the development of townhouses and thus potentially expanded the available forms of housing in Garden City by defining townhouses within the Village's zoning code for the first time, there is minimal evidence in the record that Garden City had any real interest in adding townhouses as a residential form prior to the rise in public opposition to R-M zoning. Indeed, the only evidence cited for this point by Garden City is brief testimony from Filippon that Garden City had previously recognized the fact that it did not have townhouses available for prospective buyers. Yet R-T zoning was not actually necessary to further this goal, nor did it actually accomplish it. Fish and Filippon both testified that townhouses would have been permissible as a residential form even under R-M zoning. Similarly, R-T zoning did not actually "promote" townhouses, as Fairhaven, the winning bidder for the Social Services Site, planned to develop single-family homes. The same logic also undermines

73

Garden City's purported interest in using R-T as a transition zone between single-family homes and the commercial district abutting the Social Services Site. Multi-family housing would have provided a similar transition and the ultimate selection of Fairhaven meant no transition at all.

Finally, citizen concerns regarding school overcrowding do not cast doubt on the district court's mixed–motive analysis. The district court noted Fish's estimate that while single-family homes would, on average, produce one additional schoolchild, under R-M zoning "[w]ith a community aimed at young couples and empty nesters there could be as few as 0.2 to 0.3 public school children per unit." Special App'x at 158 (citing App'x at 1382). At trial, Fish reiterated these assessments. App'x at 273 (agreeing that "it still holds true" "that there would be a smaller number of children generated by multifamily housing under RM than with the development of single-family homes"). Fish further agreed that those who questioned these assessments "were simply wrong." App'x at 277. In addition, at the public hearing, Suozzi and others deemed citizen complaints about potential school overcrowding "not accurate." App'x at 1255. Although Garden City argues that a change in the resident mix would have

74

altered these numbers, the district court was entitled to rely on the figures in the record undercutting this concern.[5]

Accordingly, we find no clear error in the district court's determination that, while these concerns may have motivated in part the decision to adopt R-T zoning, the decision would not have been made in the absence of a discriminatory motive.

Failing to show clear error in the district court's mixed-motive analysis, Garden City questions the mode of this analysis. Garden City argues that the district court improperly placed the burden on the Village to show that it would have made the same decision even in the absence of a discriminatory motive, and should have instead placed the burden on Plaintiffs to show that discrimination was the "but-for" cause of the rezoning decision. Garden City's critique of the district court's analysis relies on the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), where the Court held that because the ADEA prohibits adverse actions taken "because of" an employee's age, ADEA plaintiffs cannot rely on the *Price Waterhouse* analysis, and instead bear the

---

[5] Although the district court never explicitly stated that school crowding concerns would not have led Garden City to adopt R-T zoning in the absence of discriminatory animus, this conclusion is the obvious implication of its discussion of this issue.

burden of showing that "age was the 'but-for' cause of the challenged employer decision." *Id.* at 177–78. Garden City contends that because the Fair Housing Act similarly prohibits "mak[ing] unavailable or deny[ing] a dwelling . . . because of race," 42 U.S.C. § 3604(a), the district court should have placed the burden on Plaintiffs to show that race-based animus was the but-for cause of the shift to R-T zoning.[6]

This argument is forfeited. Garden City concedes that it failed to raise this argument before the district court, and "it is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). Although we can exercise our discretion to entertain new arguments "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding," *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (internal quotation marks omitted), "the circumstances normally do not

---

[6] Garden City does not take issue with the district court's analysis regarding Plaintiffs' parallel claims under Section 1981, Section 1983, and the Equal Protection Clause, only arguing that *Gross* rejects the district court's mixed-motive analysis in the context of the Fair Housing Act. We assume, without deciding, that the original *Price Waterhouse* analysis, not the modified version adopted in the Civil Rights Act of 1991, applies to claims under Section 1981. *See Hardy v. Town of Greenwich*, 629 F. Supp. 2d 192, 199 (D. Conn. 2009) (noting that "[t]he Second Circuit has not directly addressed this question").

militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below," *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (internal quotation marks and alterations omitted). Garden City requests that we excuse the present forfeiture because the parties did not brief the issue of mixed motives below, in light of Plaintiffs' contention that Garden City's legitimate non-discriminatory reasons for rezoning were pretextual.

A review of Plaintiffs' post-trial briefing undercuts this contention. Although much of the discussion in the district court focused on pretext, an entire section in Plaintiffs' post-trial brief is devoted to the issue of burden-shifting under a mixed analysis. App'x at 1020 ("Garden City Did Not Meet Its Burden to Prove that R-T Zoning Would Have Been Adopted Had The 'Impermissible Purpose' Not Been Considered.") In this section, Plaintiffs argue that "[e]ven if R-T addressed any legitimate zoning concerns, that discriminatory animus motivated the change even in part is enough to support a finding of discriminatory intent." App'x at 1020. In addition, Plaintiffs noted that "[h]ad the 'impermissible purpose' of excluding minorities from Garden City *not* been

77

considered, R-T zoning would not have been adopted." App'x at 1022. The issue of causation and who bore what burden in showing causation among the various motives was sufficiently raised by Plaintiffs that Defendants were on notice that they could have raised their *Gross* argument. Accordingly, we decline to exercise our discretion to overlook Garden City's failure to address this issue below.

In any event, even if we considered this argument, it runs headlong into Circuit precedent. In *Cabrera*, 24 F.3d at 383, considering, inter alia, a Fair Housing Act claim, this Court adopted the *Price Waterhouse* analysis, concluding that once a plaintiff proves an adverse action "was motivated, at least in part, by an impermissible reason, . . . the defendant can prevail if it sustains its burden of proving its affirmative defense that it would have taken the adverse action on the basis of the permissible reason alone." We are bound by *Cabrera. In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (noting that a panel of this Court is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court).

Moreover, when Congress amended the FHA in 1988, the circuits were largely in agreement that if one of the motivating factors for an act was unlawful, the act violated the FHA. *See Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1042

78

(2d Cir. 1979); *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986); *Jordan v. Dellway Villa, Ltd.*, 661 F.2d 588, 594 (6th Cir. 1981); *United States v. Pelzer Realty Co.*, 484 F.2d 438, 443 (5th Cir. 1973); *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344, 349–50 (7th Cir. 1970). When Congress amends an Act "without altering the text . . . , it implicitly adopt[s] [the Court's] construction of the statute." *Inclusive Communities Project*, 135 S. Ct. at 2520 (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 244 n.11 (2009)). Although *Gross* may cast doubt on this conclusion, by its terms, *Gross* applies only to the ADEA, and we decline to address whether *Gross* applies to the FHA in the absence of clearer guidance from the Supreme Court. Accordingly, even if we overlooked Garden City's present forfeiture, we would adhere to our existing precedent.

**IV. Disparate Impact**

Garden City also challenges the district court's conclusion that the shift from R-M to R-T zoning violated the disparate impact prong of the Fair Housing Act. The Supreme Court recently affirmed that disparate impact claims are cognizable under the Fair Housing Act. *See Inclusive Communities Project*, 135 S. Ct. at 2525 (holding that "disparate-impact claims are cognizable under the Fair

79

Housing Act upon considering its results-oriented language, the Court's

interpretation of similar language in Title VII and the ADEA, Congress'

ratification of disparate-impact claims in 1988 against the backdrop of the

unanimous view of nine Courts of Appeals, and the statutory purpose").

The Second Circuit has outlined a burden-shifting test for a disparate

impact claim. Under this test, a plaintiff must first establish a prima facie case by

showing, "(1) the occurrence of certain outwardly neutral practices, and (2) a

significantly adverse or disproportionate impact on persons of a particular type

produced by the defendant's facially neutral acts or practices." *City of*

*Middletown*, 294 F.3d at 52–53 ; *see also Tsombanidis*, 352 F.3d at 575. Once a

plaintiff has presented a prima facie case of disparate impact, "the burden shifts

to the defendant to 'prove that its actions furthered, in theory and in practice, a

legitimate, bona fide governmental interest *and* that no alternative would serve

that interest with less discriminatory effect.'" *Tsombanidis*, 352 F.3d at 575

(quoting *Huntington Branch,* 844 F.2d at 936 ) (emphasis added).

In 2013, however, before the district court's decision was rendered, the

Secretary of Housing and Urban Development ("HUD") issued a regulation

interpreting disparate-impact liability under the FHA. *See* Implementation of the

Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. Part 100).  In addition to affirming disparate impact liability as an element of the FHA, it outlined the "[b]urdens of proof in discriminatory effects cases." 24 C.F.R. § 100.500(c). Under this framework, the first two steps are substantially the same as in our case law:  First, a plaintiff or charging party must come forward with a prima facie case; and second, the defendant or respondent may rebut the prima facie case by proving that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant." 24 C.F.R. § 100.500(c)(1)–(2). However, unlike *Huntington Branch* and its progeny, if the defendant meets its burden, the burden of proof shifts back to the *plaintiff* to show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3).

Instead of following HUD's framework, despite being well aware of HUD's regulation, *see* Special App'x at 168, the district court applied our traditional test. The district court concluded that Plaintiffs had established a prima facie case of disparate impact, finding that Garden City's rejection of R-M

81

zoning in favor of R-T zoning had a significant disparate impact on minorities because it "largely eliminated the potential for the type of housing that minorities were disproportionately likely to need – namely, affordable rental units." Special App'x at 170. But the district court also found that R-T zoning advanced certain legitimate, bona fide governmental interests, noting that R-T zoning (1) would have reduced traffic and (2) would have provided for the construction of townhouses. But the district court held that Garden City "did not establish the absence of a less discriminatory alternative." Special App'x at 174. Plaintiffs argue that, as a practical matter, the district court did place the burden on Plaintiffs to show that R-M zoning was a less discriminatory alternative. *See, e.g.*, Special App'x at 175 ("Plaintiffs have established, by a preponderance of the evidence . . . [that] less discriminatory alternatives to the current zoning ordinance existed."). We are unpersuaded. It is clear that the district court shifted the burden to Defendants to prove both a legitimate, bona fide governmental interest *and* "that no alternative would serve . . . with less discriminatory effect." Special App'x at 174. The district court may have found Defendants' reasons unpersuasive, but that does not mean it placed the burden of proof on Plaintiffs in accordance with 24 C.F.R. § 100.500(c)(3).

For this reason, Garden City argues that the district court erred in requiring it to prove the absence of a less discriminatory alternative. Plaintiffs argue that Garden City's argument to this effect is waived and, in any case, contrary to Circuit precedent. But appellate courts are "bound to consider any change, either in fact or in law, which has supervened since the [district court's] judgment was entered." *Patterson v. Alabama*, 294 U.S. 600, 607 (1935); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). Here, we exercise our prudential discretion to review a potentially waived argument. *See Bogle-Assegai*, 470 F.3d at 504.

Section 808(a) of the FHA gives the Secretary of HUD the "authority and responsibility for administering [the] Act," 42 U.S.C. § 3608(a), and confers upon the Secretary authority to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this subchapter." 42 U.S.C. § 3614a. Because Congress afforded HUD the authority to implement the FHA, under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467

83

U.S. 837 (1984), this Court must defer to the agency's reasonable interpretation unless "the intent of Congress is clear." 467 U.S. at 842–43. The Supreme Court implicitly adopted HUD's approach, *see Inclusive Communities Project*, 135 S. Ct. at 2518 (stating that before rejecting a business or public interest, "a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs'" (alteration in original) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009))), and while the approaches of our sister circuits have varied in the past, many had already placed the burden of proving a less discriminatory alternative on the plaintiff or have now since deferred to HUD's interpretation, *see Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (placing the burden on plaintiffs to "demonstrate that there is a less discriminatory way to advance the defendant's legitimate interest"); *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010) (same); *Groach Assocs. #33, L.P. v. Lousiville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007) (same); *see also Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282 (5th Cir. 2014) (adopting HUD's interpretation), *aff'd and remanded* 135 S. Ct. at 2507.

84

While the district court did not address this issue below, the question of whether one of our decisions has been abrogated by an agency regulation that reflects the agency's interpretation of an ambiguous statutory provision is a question of law that we can, and should, answer ourselves. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs. (Brand X)*, 545 U.S. 967, 986–88 (2005) (considering de novo whether a previous Ninth Circuit decision was abrogated by a subsequent agency regulation). Our earlier burden-shifting approach applied in *Huntington Branch* and *Tsombanidis* may only survive if we previously held that our "construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982. Because we did not hold that the statute was unambiguous, *see Tsombanidis*, 352 F.3d at 575; *Huntington Branch*, 844 F.2d at 936, we are obliged to defer to the more recent HUD regulations. Thus, we remand to the district court for consideration of whether Plaintiffs satisfied their burden of proving an available alternative practice that has less disparate impact and serves Defendants' legitimate nondiscriminatory interests.

At the same time, we are mindful of the Supreme Court's admonishment that all too often "zoning laws and other housing restrictions . . . function

85

unfairly to exclude minorities from certain neighborhoods without any sufficient

justification" and that "[s]uits targeting such practices reside at the heartland of

disparate-impact liability." *Inclusive Communities Project*, 135 S. Ct. at 2521–22.

For this reason, we believe the district court's extensive analysis of Plaintiffs'

prima facie case merits discussion.

First, as the Supreme Court has made clear this year, zoning laws or

ordinances prohibiting construction of multi-family dwellings have been found

in violation of the FHA. *Id.* at 2522 (citing *Huntington Branch,*488 U.S. at 16–18

and *United States v. City of Black Jack*, 508 F.2d 1179, 1182–88 (8th Cir. 1974)

(invalidating ordinance prohibiting construction of new multi-family

dwellings)). Second, we find no merit in Defendants' argument that the district

court improperly allowed Plaintiffs to challenge a single, isolated zoning

"decision," rather than a general zoning "policy." Garden City argues that

disparate impact liability does not exist when a plaintiff challenges a defendant's

one-off decision. Rather than challenging the Village's zoning ordinances in

general, the Plaintiffs complain about a decision affecting one piece of property.

We decline Defendants' invitation to draw a line defining what constitutes a

"one-off" zoning "decision" as opposed to a zoning "policy." Even assuming this

distinction is relevant, given the many months of hearings and meetings, *see* Special App'x at 127–30, with charges that R-M zoning would harm traffic conditions and increase school overcrowding, and that the change required passage of a local law, we are confident this case falls well within a classification of a "general policy."

Additionally, in the Title VII and ADEA contexts, courts have permitted "cases dealing with disparate impact challenges to single decisions of employers." *Council 31, Am. Fed'n of State, Cty. & Mun. Emps., AFL-CIO v. Ward*, 978 F.2d 373, 377 (7th Cir. 1992); *see also Nolting v. Yellow Freight Sys., Inc.*, 799 F.2d 1192, 1194 (8th Cir. 1986) (considering a disparate impact case under ADEA based on a decision to use performance ratings for single layoff decision). Indeed, other circuits have described the distinction between a single isolated decision and a practice as "analytically unmanageable – almost any repeated course of conduct can be traced back to a single decision." *Council 31*, 978 F.2d at 377.

Moreover, Plaintiffs also note that there are two methods of proving the discriminatory effect of a zoning ordinance: (1) "adverse impact on a particular minority group," and (2) "harm to the community generally by the perpetuation

of segregation." *Huntington Branch*, 844 F.2d at 937 (recognizing both forms of disparate impact under FHA). Here, the district court concluded that "the R-T zone's restriction on the development of multi-family housing perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately only 4.1% of the overall population . . . and only 2.6% of the population living in households." Special App'x at 171.

For these reasons, we agree with the district court's assessment that plaintiffs more than established a prima facie case. We also agree that Defendants identified legitimate, bona fide governmental interests, such as increased traffic and strain on public schools. But for the reasons stated above, we remand for consideration of whether Plaintiffs met their burden under § 100.500(c)(3).

**V. Cross-Appeal**

The final issue in this case is the cross-appeal, in which Plaintiffs challenge the district court's dismissal of Nassau County at the summary judgment stage. We review orders granting summary judgment de novo, focusing on whether the district court properly concluded that there was no genuine dispute as to any

88

material fact and the moving party was entitled to judgment as a matter of law. *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014). We resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**A. Nassau County's Approval of Garden City's Discrimination**

The district court dismissed Plaintiffs' disparate treatment claims against Nassau County at the summary judgment stage, concluding that they failed to raise factual issues as to whether the County bore a sufficient causal relationship to Garden City's discriminatory shift in zoning. The district court concluded that the County lacked legal power over the chosen zoning designation for the Social Services Site. It further refused to hold the County liable for failing to combat, either formally or informally, Garden City's discrimination. The district court dismissed the disparate impact and Equal Protection claims against the County based on the rezoning on similar logic.

89

Plaintiffs contend that the district court erred in concluding that the County did not bear responsibility for the shift to R-T zoning, arguing that they raised genuine disputes as to material fact issues on this point. Plaintiffs' argument has two prongs: (1) the County knew that opposition to R-M zoning was racially animated, and (2) the County had legal responsibility for R-T zoning.

As to the first issue, we agree with the district court that, at the summary judgment stage, Plaintiffs raised a genuine issue of material fact as to whether County officials understood the opposition to R-M zoning as race-based. However, we also agree with the district court that Plaintiffs have not raised a genuine issue of material fact on the second issue – whether the County had legal responsibility for Garden City's adoption of R-T zoning. We do not find either of Plaintiffs' arguments on this second point persuasive.

**1. Section 239-m**

First, Plaintiffs argue that under New York law, the Nassau County Planning Commission was required to review Garden City's proposed R-T zoning ordinance before it was enacted, and to "recommend approval, modification, or disapproval, of the proposed action, or report that the proposed

90

action has no significant county-wide or inter-community impact." N.Y. Gen. Mun. Law § 239-m(4)(a). This law gives the Commission "an advisory veto which the town or village legislative body can override by a vote of a majority plus one of such body's total membership." *We're Assocs. Co. v. Bear*, 317 N.Y.S.2d 59, 60 (N.Y. App. Div. 1970) ("[S]ection 239-m does not give the Planning Commission an absolute veto power . . . ."). Here, rather than objecting to R-T zoning under Section 239-m, the Commission issued a report approving the zoning.

Plaintiffs argue that despite knowing the law to be discriminatory, the County did not exercise its advisory power to disapprove the zoning law. Plaintiffs argue that the County's failure to formally disapprove a shift it knew was discriminatory implicates the County in Garden City's discrimination. This Court has previously held that, in the context of discrimination claims, "[l]iability may be premised not only on action but on a refusal to act." *United States v. City of Yonkers (Yonkers II)*, 96 F.3d 600, 613 (2d Cir. 1996). In situations where an official "ha[d] authority to intervene, and he knew about the discriminatory practices . . . then he could be liable." *Comer v. Cisneros*, 37 F.3d 775, 804 (2d Cir.

1994). However, Plaintiffs' argument that Nassau County could have prevented Garden City's discriminatory zoning is premised on speculation.

Plaintiffs concede that Garden City could have adopted R-T zoning over the County's veto with a majority plus one vote. And in this case, Garden City's Board of Trustees adopted R-T zoning *unanimously*. This unanimous vote would seem to obviate any causal role for Nassau County in the adoption of R-T zoning. Since Garden City could have overridden any County disapproval, any advisory disapproval by the County would likely have been ineffective.

Generally, "speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Here, Plaintiffs argue, without any evidence of past practice, that the Nassau County Planning Commission could use the advisory veto contained in Section 239-m as a bully pulpit for the County to shame towns and villages in danger of acquiescing to the race-based animus of their citizens. As an initial matter, Plaintiffs provide no evidence that the County has previously exercised such authority. Indeed, Nassau County points to evidence that the Planning Commission's role was to act as a harmonizer between communities and not as a super-agency tasked with keeping discriminating localities in line. App'x at 2833

("The purpose of the Commission's review is to provide input on actions that may have an impact across municipal boundaries, or that may be of area-wide significance and therefore require coordination among municipalities."); *cf. Yonkers II*, 96 F.3d at 618 (finding that the applicable statute placed a "responsibility" on state officials "to take steps to achieve desegregation").

Moreover, even if disapproving potentially discriminatory actions by municipalities does fall within the ambit of the Commission's authority, the County's causal role in the ultimate decision is tenuous. In contrast to previous cases, there is no clear power of override, nor is there evidence that the limited power of non-binding disapproval carries any weight. *Cf. Yonkers II*, 96 F.3d at 618 ("[W]here the Commissioner and the Board of Regents find that racial imbalance in the schools of a given community has made the schools educationally inadequate, the Commissioner has *virtually unreviewable authority* under the Education Law to order student transfers in order to eliminate the imbalance." (emphasis added)). To be sure, an advisory veto constitutes some power to intervene, and on a stronger evidentiary showing of past practice, such failure to utilize the power of disapproval may provide a basis for liability.

However, on the present record, we agree with the district court that Plaintiffs' claim against Nassau County is premised on speculation.

**2. Override for Public Use**

As an additional argument for the County's authority to override Garden City's zoning, Plaintiffs argue that on the facts of this case, the County had the obligation to exercise its authority to override local zoning control. Plaintiffs concede that New York law vests authority over zoning with local governments. However, Plaintiffs rely on a line of cases in which New York courts have permitted counties to override town zoning ordinances for the county's own land use where the county's interest in the non-conforming use is greater than the town's interest in enforcing its land use regulations. *See Matter of Cty. of Monroe (City of Rochester)*, 530 N.E.2d 202, 204–05 (N.Y. 1988). Plaintiffs contend that Nassau County should have employed this limited authority to override local zoning decisions here, in light of its knowledge of the R-T rezoning's discriminatory basis. We disagree.

The New York Court of Appeals has recognized that counties may ignore local zoning when necessary for public use. In determining when such an override is permitted, New York courts balance a number of factors including

"the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests." *Id.* at 204 (internal quotation marks omitted). For example, in *County of Monroe*, Monroe County's interest in the expansion of an airport outweighed the City of Rochester's interests in land use regulation. *Id.* at 205 ("The airport terminal, parking facilities, and air freight facility are embraced within the immunity from the requirements of the City's land use laws because they constitute accessory uses customarily incidental to an airport operation."). The New York Court of Appeals has applied this same balancing test in cases where private actors performing public functions on government land seek an exemption from local zoning laws. *See Matter of Crown Commc'n N.Y., Inc. v. Dep't of Transp. of N.Y.*, 824 N.E.2d 934, 935–36 (N.Y. 2005). In *Crown*, the New York Court of Appeals concluded that "the installation of private antennae on two state-owned telecommunications towers [was] exempt from local zoning regulation" because such private antennae served a number of significant public interests. *Id.* at 935, 938. The court concluded that "such equipment is therefore embraced within the

95

immunity already afforded to the state-owned towers pursuant to the balancing test." *Id.* at 940; *see also Westhab, Inc. v. Vill. of Elmsford*, 574 N.Y.S.2d 888, 891 (N.Y. App. Div. 1991) (finding under balancing test that homeless shelter, as tenant on land leased from County, was exempt from local zoning).

Based on these cases, Plaintiffs argue that Nassau County had an obligation to override Garden City's R-T zoning on their behalf, since they proposed to buy the Site and build affordable housing. Plaintiffs contend that there is a strong public interest in building affordable housing and that the County should have taken steps to protect developers who planned to further this interest by explicitly adopting resolutions overriding Garden City's zoning. However, there is a crucial difference between the cases cited and the present one. As the district court recognized, these cases are distinguishable because they did not involve situations such as this, where a private developer is merely purchasing land from the county to pursue its own endeavor. Rather, the cases cited all involve exemptions for uses where the state or county continued to own the land during the public use. Although private entities were not precluded from joining in the state or a county's immunity against local zoning, in these cases, the private party was still a tenant on government-owned land. In this

96

case, even if the County were to achieve an override of Garden City's zoning for itself, the Site would eventually be sold to a private developer. Although New York cases provide for zoning immunity by private actors when working with the government on state or county land, they say nothing about whether a state or county may transfer this immunity to a private developer as part of a property sale. Indeed, Plaintiffs have not cited, and we are not aware of, New York cases applying the public interest balancing test in situations where a private developer is purchasing land from a county to pursue its own project.[7] Absent further guidance from the New York Court of Appeals, we decline to extend these cases to find that Nassau County had the legal authority and responsibility to override Garden City's zoning on behalf of a potential private buyer.

**B. Nassau County's Steering of Affordable Housing**

In addition to their claims relating specifically to the R-T rezoning, Plaintiffs also bring claims against Nassau County more generally, accusing the County of steering affordable housing to its low-income, majority-minority

---

[7] We note that as part of their initial protest proposal, Plaintiffs proposed a lease agreement with Nassau County, which could have potentially created a public-private partnership on land that would still be owned by the County. However, Plaintiffs' directly competitive bid to purchase the Social Services property, not their lease proposal, is the basis for their standing in this case. Assuming Plaintiffs' bid would have been successful, they would have owned the property, not Nassau County.

communities. Plaintiffs claim that Nassau County has an explicit policy of steering affordable housing to low-income, majority-minority communities. On this point, they note statements in documents submitted to HUD between 1995 and 2010 in which Nassau County states, "Nassau County currently targets its comprehensive community development efforts in a number of lower income and minority areas such as Roosevelt, Inwood, Hempstead Village, New Cassel, and Freeport." *See, e.g.*, App'x at 2575, 2616, 2651, 2854. In other portions of these filings, Nassau County states "[f]or three decades, Nassau County has provided . . . funds to local governments and non-profits to acquire sites exclusively in low and moderate-income census tracts." App'x at 2598. Further Plaintiffs' expert testified that County-subsidized affordable housing aimed at families and first-time buyers is steered toward majority-minority communities, while affordable housing for the elderly is placed in majority-white communities.

The district court considered these allegations under 42 U.S.C. § 3608 (Section 808 of the FHA), and concluded that Section 808 does not provide a private right of action. Plaintiffs do not challenge the district court's conclusion with respect to Section 808 on appeal. However, they argue that the district court failed to consider the relevance of these same factual allegations to Plaintiffs'

claims under 42 U.S.C. § 3604(a) (Section 804(a) of the FHA) and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. As discussed previously, Section 804(a) of the FHA provides for discriminatory intent and disparate impact liability under the FHA. Title VI provides for discriminatory intent liability against entities that receive federal funding.

The County does not contest that Plaintiffs raised Section 804(a) and Title VI claims relating to Nassau County's steering of affordable housing, or that the district court failed to consider these allegations in ruling on these claims. Thus, rather than pass on these factually-intensive claims for the first time on appeal, we follow our typical practice, and remand for the district court to address these claims. *See Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 208 (2d Cir. 2003) ("It is this Court's usual practice to allow the district court to address arguments in the first instance.").

**CONCLUSION**

In conclusion, we hold as follows:

(1) Plaintiffs have Article III standing. Due to the inherent uncertainties in the housing market, plaintiffs filing claims under the FHA need not show with absolute certainty that their project would succeed absent

the challenged action. We find no clear error in the district court's findings to this effect, and thus are satisfied that Plaintiffs have met the elements of standing. Therefore, we **AFFIRM** the relevant portions of the judgment of the district court insofar as it found Plaintiffs have standing.

(2) Plaintiffs' claims are also not moot. Under the voluntary cessation doctrine, a party may not evade judicial review by temporarily altering its behavior. Under this doctrine, Defendants did not meet their stringent and formidable burden of showing that it is absolutely clear that it will not permit the challenged conduct to resume. Thus, we **AFFIRM** the relevant portions of the judgment of the district court insofar as it found Plaintiffs' claims are not moot.

(3) We further hold that the district court did not commit clear error in finding that Garden City's decision to abandon R-M zoning in favor of R-T zoning was made with discriminatory intent, and that Defendants failed to demonstrate they would have made the same decision absent discriminatory considerations. Thus, we **AFFIRM** the judgment of the district court insofar as it found Plaintiffs had established liability

under 42 U.S.C. § 3604(a) of the FHA based on a theory of disparate treatment.

(4) We further hold that 24 C.F.R. § 100.500(c) abrogated our prior precedent as to the burden-shifting framework of proving a disparate impact claim. Accordingly, we **VACATE** the district court's judgment insofar as it found liability under a disparate impact theory, and **REMAND** for further proceedings to determine, in accordance with § 100.500(c)(3), whether plaintiffs have met their burden of proving that the "substantial legitimate,  nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."

(5) Finally, we hold that the district court properly dismissed Plaintiffs' disparate treatment claims against Nassau County at the summary judgment stage. While we agree that Plaintiffs raised a genuine issue of material fact as to whether County officials understood the opposition to R-M zoning was race-based, we agree with the district court that Plaintiffs have not raised a genuine issue of material fact as to whether the County had legal responsibility for Garden City's adoption of R-T

zoning. Therefore, we **AFFIRM** the district court's judgment dismissing Plaintiffs' disparate treatment claims against Nassau County at the summary judgment stage. But with respect to Plaintiffs' claims under Section 804(a) and Title VI relating to Nassau County's "steering" of affordable housing, we **REMAND** for the district court to address these claims.

For the foregoing reasons, we **AFFIRM** the judgment of the district court in part, **VACATE** in part, and **REMAND** for further proceedings in accordance with this opinion.